HANNAH, AD. VS. CARRINGTON ET. AL.

The equity doctrine is, that a mortgage is a mere security for the debt, and only a chattel interest; and until a decree of foreclosure the mortgager continues the real owner of the fee—though the rule is different at law. The equity of redemption is considered to be the real and beneficial estate, tantamount to the fee at law.

A deed of trust, to secure the payment of a debt, with power of sale by the trustee on default of payment, vests the legal title in the trustee for the purpose of enabling him to sell the property and pass the title to the purchaser without the necessity of resorting to equity to foreclose, but is not an absolute conveyance—the debtor having the right, at any time before sale, to redeem the property by paying the debt.

The equity of redemption, upon the death of a mortgager, passes to his administrator, and may be sold by him and transferred to the purchaser.

A decree of a Court of chancery must be regarded as regular, so far as they are concerned, who were parties to the bill: but not so as to affect any right which was not within the scope of the bill, nor put in issue by it.

An affirmative allegation in an answer, if not denied by replication, must be taken as true.

In trust sales there is no doubt that the property should be present when sold: but a stranger to the trust has no right to object that the property was not actually present at the sale.

| 18 | 85 |
|----|-----|
| 54 | 184 |
| 18 | 85 |
| 55 | 544 |
| 18 | 85 |
| 58 | 291 |
| 18 | 85 |
| 59 | 292 |
| 18 | 85 |
| 61 | 128 |
| 18 | 85 |
| 71 | 517 |
| 18 | 85 |
| 73 | 592 |

As in private and judicial sales, if the property, at the time of the sale by a trustee, is in the hands of one claiming it by an adverse title, the legal title will not vest in the purchaser so as to enable him to maintain an action therefor in his own name.

A subsequent mortgagee of a part of the property embraced in a prior mortgage, may, after exhausting all his other securities without satisfaction, file a bill in equity against the prior mortgagee for the purpose of subjecting such property by compelling him to foreclose, and resort, first, to the other property embraced in his mortgage.

Where a deed of trust for the benefit of creditors is given to two or more trustees, and one of them dies, the survivor may execute it.

In a deed of trust the power of sale is coupled with the legal estate in the hands of the trustee: and, also, with a trust for the benefit of the *cestui que trust*, and is not affected by the death of the grantor.

*Quere:* Does the term " mortgage" as used in the Statute (*Digest ch.* 110, *sec.* 1–2,) requiring mortgages upon personal property to be recorded in the county where the mortgager resides, embrace deeds of trust?

Where the property conveyed to trustees to secure a debt consists of a plantation and many negroes, and the *cestue que trust* causes the whole to be offered in a lump, instead of offering it in such lots and parcels as would suit the convenience of bidders, it is an unfair mode of sale. A *cestue que trust* thus acting and bidding off the whole for less than his debt, does not acquire such an equitable title as a Court of chancery should protect and confirm against the owner of the equity of redemption, as to a part of the property embraced in a prior mortgage.

*Appeal from the Circuit Court of Hempstead county.*

The Hon. SHELTON WATSON, Circuit Judge.

PIKE & CUMMINS for appellant.

As far as the equity of redemption in the two negroes was concerned, Mrs. Carrington owned that, under the agreement between her and Bouldin; and the effect of the decree in favor of Fowlkes, was to confirm both sales to him, that under order of the Probate Court and that made by Hannah, the trustee, and absolutely decreed to Fowlkes all the title which Carrington had at his death in the property so sold.

A deed of trust with power of sale will be regarded in equity simply as a mortgage, with like power. Equity regards the mortgagor as still owning the fee, and the mortgages as merely creating successive charges on the property, by way of lien or collateral security: and even where sale is made under a power

contained in a formal mortgage, such sale is equivalent to a statute foreclosure. *Jackson vs. Henry,* 10 *J. R.* 185; *Jackson vs. Bowen,* 7 *Cowen* 13; *Demarest vs Wynkoop,* 3 *J. C. R.* 129; *Doolittle vs. Lewis,* 7 *J. C. R.* 45. And therefore the sale by order of the Probate Court, that by the surviving trustee, and the decree, all taken together, are undoubtedly equivalent to a foreclosure.

Fowlkes is entitled to have the matter closed. At the very least, he is still junior mortgagee, and has a right to foreclose on *Peter and Iverson;* and to compel the assignee of Easely to release to him, or proceed likewise to foreclose, or sell first the other property embraced in his mortgage.

It is not necessary that Fowlkes should show that the other property conveyed by the deed of trust was not sufficient to pay his debt. Being junior mortgagee, he had, before his condition was changed, and while he held as mere mortgagee, the right to keep his own security intact, and to compel Easely, and his equitable assignee to resort, first, to the other property mortgaged to Easely. And when he bought under the deed of trust, his title related to the creation of the power; and he held precisely as if that deed had been an absolute, unconditional conveyance to himself of the title, subject only to Easely's charge. *Doolittle vs. Lewis,* 7 *J. C. R.* 48; *Cook vs. Dickenfield,* 2 *Atk.* 562; *Marlborough vs. Godolphin,* 2 *Ves.* 78.

It is perfectly certain that the estate and representatives of Carrington have no further claim to these two negroes, of any kind whatever. Carrington mortgaged them to Easely; then he mortgaged his equity of redemption in them to Fowlkes. Bouldin purchased such interest as Carrington had remaining; and that was a right to redeem by paying both mortgages: that is, he bought the equity of redemption, subject to the mortgage of it to Fowlkes. Fowlkes forecloses his mortgage, himself buying. Then *he* holds the equity of redemption, and Bouldin loses all his interest in the property for the sale under the power, equivalent to a foreclosure, reaches back, behind his purchase, and cuts him out altogether, carrying the equity of redemption to Fowlkes, as if it had originally been assigned to

him; and has just the same effect as a regular decree of fore-closure—which, barring Bouldin of his equity to redeem the equity of redemption, gives the purchaser under the decree the whole equity of redemption. There is, therefore, absolutely nothing left, but whatever may still remain due of the debt to Easely, and Fowlkes' title to the negroes, subject to that debt.

But, if we regard Mrs. Carrington or Bouldin as holding the equity of redemption in these two negroes, the result will be precisely the same. Where the assignee of an equity of re-demption only, pays off the older lien, in case there is a junior one or a subsequent purchase, there is no reason why the lien so paid off should be kept alive for his benefit.

The law always presumes that the vendor or mortgagor, when paying off a prior lien created by him, does so in order to relieve the property, for the benefit of his vendee or mort-gagee. And so also is it as to his assignee of the equity of re-demption only. The purchaser of an equity of redemption, where there are successive mortgages, or a prior mortgage and then a sale, who pays off the prior debt, is supposed to pay it in order to relieve the estate, and not to take an assignment of it. He stands in the place of the mortgagor, and his acts are to be considered the acts of the mortgagor. *Tice vs. Annin*, 2 *J. C. R.* 129; *Eaton vs. George*, 2 *New Hamp.* 300; *Taylor vs. Barrett*, 3 *New Hamp.* 298; 6 *J. C. R.* 393; 6 *Pick.* 492; 11 *Ib.* 294.

On the death or refusal to act of one or more of several co-trustees, the office devolves, with the legal estate, on the sur-vivors, or those who accept. *Hill on Trustees* 175, 204, 303; *Stewart vs. Pettus*, 10 *Missou.* 755; *Folley vs. Wontner*, 2 *Jac. & Walk.* 248; *Owen vs. Owen*, 1 *Atk.* 496; *Osgood vs. Franklin*, 2 *J. C, R.* 19; *Franklin vs. Osgood*, 15 *J. R.* 553; *Peter vs. Beverly*, 10 *Peters* 563; 8 *Sim.* 130; 1 *Vent.* 128; 9 *B. & Cres.* 306; 2 *B. & Ald.* 405; *Jones vs. Maffett*, 5 *Serg. & R.* 523.

Easely or his executor, by the new arrangement made with Bouldin, whereby enlarged time was given for payment, post-poned his lien on these two negroes to that of Fowlkes; because he thereby incapacitated himself to enforce his lien on demand

by Fowlkes, and prevented the latter from foreclosing, or caus-
ing sale by the trustees; and prevented him from relieving the
property in question of that lien in any way, by payment even
of a proportional part of the debt to Easely.

WATKINS & GALLAGHER for the appellees.

As the holder of the equity of redemption, Bouldin cannot
gainsay the lien of the trust deed to Fowlkes; but as the equit-
able assignee of Easely, he became subrogated to his rights to
this intent, and no further; that holding the prior mortgage on
Peter and Iverson, he has the right to insist that Fowlkes should
fairly exhaust all the other trust property and demonstrate its
insufficiency in the mode provided by law, before he could re-
sort to the mortgaged property, or redeem Peter and Iverson,
or cause them to be subjected to his debt in any way.

Easely having the prior mortgage was under no obligation
to foreclose it. A junior incumbrancer might either foreclose or
sell subject to the prior incumbrance, or pay it and take an as-
signment of it, or bring a bill to redeem, and have an account
taken of the amount due upon it, if there was any doubt or
controversy on that score. *Trapnall vs. Richardson*, 13 *Ark*. 552;
*Watkins vs. Wassell*, 15 *Ark*. 90.

As neither Easely or Bouldin were parties to the chancery
suit to confirm the sale made by the trustee to Fowlkes, they
are not bound by the decree; nor are the widow and heirs of
Carrington, who were parties, bound to any further extent than
the scope and object of the bill.

1. Fowlkes acquired no title to Peter and Iverson by virtue of
his purchase of the equity of redemption from Rust, and Rust
himself had acquired none, because the equity of redemption
had been previously sold by the administratrix to Bouldin.

2. He acquired no title to Peter and Iverson under the trus-
tee's sale made by Hannah because those slaves were not in
possession of the trustee, and were not present at the sale, and
there was and could be no delivery of them to the purchaser.
*Sheldon vs. Soper*, 14 *J. R.* 353; *Jackson vs. Striker*, 1 *J. Cas.* 287;
*Cresson vs. Stout*, 17 *J. R.* 116; *Linnendall vs. Doe*, 14 *J. R.* 222;

7

*Woods vs. Monell,* 1 *J. C. R.* 503; *Green vs. Green,* 9 *Cowen* 46; *Allen on Sheriffs,* 171; *Smith vs. Pope's heirs,* 5 *B. Mon.* 337; *Greenleaf vs. Queen,* 1 *Peters* 138.

3. He acquired no title by Hannah's sale, because it was made by one of two joint trustees, and when the deed itself contained a provision for supplying any vacancy that might occur—the authority being a mere naked power to sell not coupled with any interest in the trustee: on the authorities cited by the appellant himself, the point is against him.

4. The sale was made, after the death of Carrington, by a trustee who had not a power coupled with an interest in the subject matter of the trust or power. See *Nick's heirs vs. Rector,* 4 *Ark,* 280; *Gates vs. Prior,* 6 *Eng.* 78; *Garland vs. Nunn, ib.* 729.

Where a deed of trust is given merely to secure the payment of a debt, and the trustee has no interest in the estate other than to expose it to sale on failure to pay the money there is no real or solid distinction between such a security and a mortgage. 4 *Kent Com.* 147; 2 *Hill. Ab.* 544, *and cases there cited;* 1 *Hill. Ab.* 206 *sec.* 34; *Brown vs. Morrison,* 5 *Ark.* 217; *Smith vs. Robinson* 13 *Ark.* 533; 2 *Rob. Va. Rep.* 530; 8 *Ala.* 690, 7 *Humph.* 72, 77; 7 *Sm. & Mar.* 319; 1 *Eng.* 269. Wherever the instrument is intended as a security for the payment of money, whatever may be the form of the contract, the mortgagor is entitled to redeem. *Casbourne vs. Scarfe* 1 *Atkyns* 603; *Howard vs. Harris,* 1 *Vernon* 190; *Skinner vs. Miller,* 6 *Littell* 184; *Clark vs. Henry.* 2 *Cowen* 324; *Conway's Exr. vs. Alexander,* 7 *Cranch* 218; 1 *Dana* 200; 9 *N. Hamp.* 69; 3 *Ark. Rep.* 364; 5 *ib.* 321; *Moore vs. Anders,* 14 *Ark.* 638.

Whatever rights Fowlkes may have had as to the other property, it is clear that as to Peter and Iverson his lien was inferior and subject to that of Easely under his prior mortgage, which included them. He has no right to subject them to the satisfaction of his claim, except upon the contingencies, first, that the other property mortgaged to him is insufficient, and second, that the other property which the prior mortgage bears upon is more than sufficient. 2 *Lead. Cases in Equity* 194 *and authori-*

*ties cited; Freem. Chy.* 574; 1 *Paige* 185; 5 *J. C· R·* 320; 15 *J. R.*, 485.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

In January, 1852, Edward B. Fowlkes filed a bill in the Hempstead Circuit Court, against *Joanna T. Carrington, Albert Rust* and *Richard Boyd*, as executor of *Wm. B. Easely*, for the recovery of two slaves, etc. The material allegations of the bill are as follows:

On the 12th of August, 1843, Robert Carrington, of Hempstead county, executed a mortgage to Wm. B. Easely of Virginia, upon forty two slaves, among which were *Peter* and *Iverson*, to secure the payment of a bond for $12,229 71, due at the time. The mortgage extended the day of payment to the 1st of January following. The slaves embraced in the mortgage were upon Carrington's "*Caruse*" plantation in Hempstead county.

On the 21st of January, 1845, Robert Carrington and wife, Joanna T., made a deed of trust, conveying to Samuel Baldwin and Joel W. Hannah, as trustees, the several tracts of land embraced in Carrington's "*Lost Prairie*" plantation in Lafayette county, with forty slaves, to secure to Edward B. Fowlkes the payment of a debt of $10,780 34, in three equal annual instalments, falling due 1st of April 1846–47–48, with interest at ten per cent. from the date of the deed. The deed to be void on payment of the debt by Carrington, but on his failure to meet the instalments at maturity, the trustees were empowered to make public sale of the property, etc. If they failed to attend to the execution of the trust, Fowlkes was empowered to appoint one or more trustees to act in their stead, etc. Among the slaves named in this deed of trust were the same *Peter* and *Iverson* embraced in the mortgage to Easely. The deed was recorded in Lafayette.

In the latter part of the year 1845, Robert Carrington died, and his wife, Joanna T. was appointed his administratrix by the Hempstead Probate Court.

On her application, for the purpose of paying debts, said Probate Court, on the 22d of January, 1846, made an order for her

to sell " all the right, title and interest" of Carrington in the lands and slaves embraced in Fowlkes' deed of trust—sale to be made at the *Lost Prairie* plantation, on the 21st of February, 1846. The interest of Carrington in the property was accordingly sold, and purchased by Albert Rust, Carrington's son-in-law, for the aggregate sum of $500, and conveyed by the administratrix to him.

On the 8th of June, 1846, the debt of Fowlkes remaining wholly unpaid, he purchased of Rust, for the sum of $8,526 54, the title so acquired by him, and took the conveyance of himself and wife therefor; and, thereupon, obtained possession of the lands, and all of the slaves named in the deed of trust, except *Peter and Iverson*, and had from thence forward continued in the undisturbed possession thereof. He had never had possession of *Peter* and *Iverson*.

That, desiring to perfect his title, doubting the validity of the sale under the order of the Probate Court, his entire debt remaining unpaid, and *Baldwin*, one of the trustees named in the trust deed, having died, the complainant Fowlkes caused Hannah, the surviving trustee, to sell the lands and slaves embraced in the deed, at public sale, on the 3d day of June, 1848, according to the provisions of the trust, and the complainant purchased the whole of the property for the aggregate sum of $15,000: and paid the expenses of the trust, etc.

Being afterwards advised, by counsel, that the surviving trustee had no power to make the sale, complainant took no deed from him: but on the 2d of May, 1849, filed a bill in the Lafayette Circuit Court, against the administratrix and heirs of Carrington, and on the 30th of October, 1850, obtained a decree, without contest, confirming the sale, and complainant's title to the property.

That Easely had died in Virginia, and Boyd had been appointed his executor: and that the former, in his lifetime, or the latter, since his death, had made some contract with Mrs. Carrington, by which the time for the payment of Easely's debt had been extended, and she was permitted to keep possession of the slaves named in the mortgage. That she, or Rust, had

been in possession of *Peter* and *Iverson*, ever since the death of Carrington. They were worth $900 each, and their annual hire $125 each.

Part of Easely's debt had been paid, but the amount still due him was so much larger than the value of Peter and Iverson, that complainant could not, with any advantage, redeem them by paying off the mortgage: but that the other slaves, embraced in the mortgage, were amply sufficient to satisfy the whole of the debt.

That, by the delay of Easely and his executor, and the extension of time given to Mrs. Carrington, the lien of the mortgage had, in equity, been postponed, and, as against complainant, was no longer a charge upon *Peter* and *Iverson*.

Prayer—that the Court decree to complainant possession of these two slaves, with the value of their hire, etc., as against Mrs. Carrington and Rust, and that Easely's executor be required to foreclose his mortgage, and have resort first to the other slaves for satisfaction before touching *Peter* and *Iverson*.

Boyd, the executor of Easely, states in his answer to the bill, that no steps had been taken to foreclose the mortgage, because he supposed that no one but himself as such executor, and Wood Bouldin, had any interest in the matter. That, after the death of Carrington, the interest of his estate in the slaves embraced in the mortgage, was sold by an order of the Probate Court, and purchased by Bouldin. That, on the 18th of August, 1845, Easely made an agreement with Bouldin, by which he consented to receive payment of the mortgage debt by annual instalments of $2,000, to commence on the 1st June, 1847, etc. Under this agreement, Bouldin paid to Easely, in his lifetime, $624 13, and to respondent, since his death $9,811 79. By the agreement, Easely did not surrender the lien of the mortgage to Bouldin, but expressly retained it as security for the debt, and respondent claimed the right to hold the mortgage as such security until the entire debt was extinguished under the agreement: a copy of which was exhibited, etc. Respondent knew nothing of the claim of complainant to the slaves *Peter* and *Iverson*, until the filing of the bill, etc.

On the coming in of Boyd's answer, Fowlkes filed an amendment to his bill, making Bouldin a party defendant, alleging that he claimed to have purchased the equity of redemption of Carrington's estate in the mortgaged property; setting out the agreement between Easely and Bouldin, the payments made, and the amounts due, etc. That Bouldin was the brother of Mrs. Carrington, and purchased the equity of redemption, and made the agreement with Easely for her benefit, in order that she might pay off the mortgage debt, and retain the slaves. That she had retained the possession of the slaves, and made the payments upon the mortgage debt, under Bouldin's agreement with Easely, out of the proceeds of their labor. That by the terms of the agreement, the time had been extended for the payment of the mortgage debt, but that Bouldin had failed to comply with his part of the agreement, and Easely's executor had the right to foreclose at once; etc. Prayer as in the original bill.

Albert Rust and Mrs. Carrington did not answer the bill.

Bouldin answered, substantially, as follows: That, under an order of the Probate Court of Hempstead county, Mrs. Carrington, as administratrix of Robert Carrington, on the 23d of May, 1845, made a public sale of all the right, title and interest of the estate of her intestate, in and to the slaves mortgaged, by him to Easely, and that respondent, in the presence of complainant, Fowlkes, became the purchaser thereof at the sum of $500. Respondent was advised that the order and sale were made in accordance with the Statute, etc., and the title so acquired by him valid. After the sale, having complied with the terms thereof, the administratrix executed and delivered to him a deed for the interest in the property so purchased by him. The order of the Probate Court, etc., and the deed, are exhibited.

"To the allegation that the purchase was made by respondent for the benefit of his sister, Mrs. Carrington, or for her, and her children, he answers that if complainant meant thereby that respondent was the agent of his sister, etc., in making the purchase, or that, prior to the purchase, he entered into any agreement with her, creating a trust between him and her, etc., then,

respondent wholly denies the allegation. He was advised and knew, as well on the general principles which regulate the conduct of fiduciaries, as under the special provisions of the Arkansas Statute, that she had no legal right, either in her own name or through the agency of another, to make such a purchase. It is true, that it was the object of respondent, in leaving his home in Virginia, and visiting Arkansas, as he did, in the spring of 1845, to render such aid as he lawfully might to his sister and her children, in their unexpected pecuniary difficulties, and respondent's purpose was well known to them. If, then, the complainant meant to allege, that it was the purpose of respondent, in making said purchase, to take no personal benefit therefrom, other than the gratification of aiding his sister and her children, but to give the entire benefit thereof to his sister, respondent willingly and fully admits the allegation. Such was his purpose, and his sole purpose, and he has yet to learn, that by the code of that or any other State, there is any moral, legal or equitable obstacle to such a purchase, for such an object. If so, respondent must abide the consequences of his error: he, certainly, would not attempt to conceal it."

The circumstances under which the sale was ordered, and the purchase made by respondent, were these: The estate of Carrington was found to be indebted to utter insolvency. All his assets not embraced in the mortgage to Easely, and the deed of trust to Fowlkes, were more than covered by judgments—no part of Fowlke's debt was due, but the interest upon Easely's debt was in arrear: there were no assetts in the hands of the administratrix, out of which it could be paid: the mortgage was subject to foreclosure, and Easely's attorney had given notice to the administratrix, that, unless the interest in arrear was promptly paid, he would proceed to foreclose, etc. Property, at that time, when put up at public auction, for cash, was selling at a great sacrifice, and the administratrix was apprehensive that if the mortgage property was brought to the block, it would not discharge the debt. Under these circumstances, the Probate Court ordered the sale of the equity of redemption, etc.

Respondent was well acquainted with Easely, and believed

he could make a satisfactory arrangement with him in Virginia: and he believed, also, that Royston, his attorney in Arkansas, would accept the interest in arrear, and waive a foreclosure of the mortgage: and for these reasons, respondent purchased the equity of redemption, bidding more for it than any one else under the circumstances. He gave his bond to the administratrix due at twelve months, with good security, for the purchase money, according to the terms of the sale.

On the 28th of May, 1845, respondent paid Royston $506 26, being the interest due on the mortgage debt, 1st January preceding, which he accepted as a compliance with the terms of the mortgage, and waived further proceedings to foreclose. This act was subsequently ratfied by Easely in person, who admitted that, under all the circumstances, the mortgage was not subject to foreclosure. The amount so paid Royston, was not received by respondent from his sister, Mrs. Carrington, but was his own money.

After respondent made the purchase, and became the absolute owner, as he supposed, of the mortgaged property, subject to the mortgage debt and the widow's dower, he made a verbal agreement with Mrs. Carrington, by which he has ever since held himself morally and legally bound, to the effect, that he would see Mr. Easely, on his return to Virginia, and by becoming personally bound for the mortgage debt, induce him to receive payment thereof in annual instalments of $2,000 each, or in instalments as favorable to respondent and his sister, as could be obtained. In the mean time that the slaves, or such of them as she desired, should remain at Mrs. Carrington's residence, and on her plantation, under the superintendence and control of respondent's brother, and as the property of respondent, but to be worked exclusively for the benefit of Mrs. Carrington, that from the proceeds of their labor, and any other resources at her command, she might pay off the bond executed to her as administratrix of Carrington by respondent for the equity of redemption aforesaid, and $106 26 borrowed by him of Rust to enable him to make the payment of interest to Royston above referred to; and in addition thereto, annually remit to respond-

ent, prior to the period of payment, such sum as he should agree to pay to Easely, until the whole mortgage debt should be discharged. When that event should occur, and all advances, which respondent might make on account of the mortgage, should be returned to him, he was to convey to Mrs. Carrington the entire interest vested in him by the sale aforesaid: and it was with a view to such an arrangement alone, that respondent made the purchase.

In pursuance of this agreement, respondent left the slaves on the plantation of Mrs. Carrington, under the control of his brother, but for her benefit, and had neither asked nor received hire for them, being entitled to none under his agreement aforesaid. And on his return to Virginia, he entered into the contract with Easely exhibited with Boyd's answer. Under which contract respondent had paid to Easely and his executor, to 1st of June, 1852, $12,942 18, on the mortgage debt, leaving a balance due thereon of $1,158 13. The amount paid, and the balance due, making $14,100 18, chargable upon the mortgaged property. A portion of the money to meet the instalments upon the mortgage debt, under the contract with Easely, was furnished to respondent by Mrs. Carrington, according to agreement with her. The balance he advanced out of his own means, and she had afterwards refunded it to him. She was in arrear with him about $400 upon such advances, at the time of answering.

A portion of the slaves named in the mortgage was still upon the Caruse place, and the others had been removed to a plantation recently purchased by Mrs. Carrington, on Red river, in Texas.

Among the slaves purchased by respondent under the sale of the equity of redemption, and left in the possession of Mrs. Carrington, under the agreement aforesaid, were *Peter* and *Iverson*, who are still in her possession. They are admitted to be the same slaves embraced in Fowlkes' deed of trust by those names.

Respondent denies that complainant, Fowlkes, has shown any title to these two slaves on either of the grounds on which

he rests it. And, first, as to his purchase from Rust, of the equity of redemption in the lands and slaves included in the deed of trust, the complainant himself expresses a doubt as to the validity of the sale to Rust, under the order of the Probate Court, and of the title derived thereby, etc. But conceding the sale to have been valid, complainant derived no title under it, to the two slaves in question. All that Rust purchased, or could have purchased, and all that complainant purchased of him, was the interest of Carrington's estate in the trust property. But all such interest in the slaves *Peter* and *Iverson* had been previously sold and purchased by respondent; and could not be sold again, etc.

Respondent submits that the interest so purchased by him was the absolute property in the two slaves, subject only to Easely's debt, to Fowlkes' debt, and to the dower right of Mrs. Carrington. That, before the complainant can show any title to the slaves in question, he must first satisfy the Court that these slaves are not necessary to discharge the Easely debt, and secondly, that they are required to discharge his own debt under the trust deed. Without inquiring whether they would, or would not be required to satisfy the mortgage, respondent insists that it is manifest from the bill itself that the complainant's debt is greatly more than discharged by the property he now holds, without a resort to these two slaves. The debt charged on the property by the terms of the deed, amounted, on the 8th of June, 1846, the date of the complainant's purchase of Rust, to the sum of $12,271 60, as follows:

Principal sum secured by the deed, $10,780 34
Interest at 10 per cent. from the date of the deed,
        to June 8th, 1846, 1,491 26

           Making $12,271 60

To secure this sum, complainant held a lien on the valuable Lost Prairie estate, and forty slaves: and the question is, was this property more than enough to pay the debt, without taking the two boys *Peter* and *Iverson*. Respondent would refer, as an answer to the question, to the act of complainant as set out in

OF THE STATE OF ARKANSAS. 99

Term, 1856.]                    Hannah ad. vs. Carrington et al.

the bill.    He actually paid in money, on the 8th of June, 1846,
for Carrington's interest in the property—that is, for what might
remain as part of Carrington's estate, *after paying the debt*—the
sum of $8,526 54: thus valuing the property at a price about
two thirds greater than the debt.    Respondent submits, there-
fore, that complainant cannot successfully maintain that the
two slaves, *Peter* and *Iverson*, were necessary to discharge his
debt; and not being required for that purpose, they belong to
respondent, he being the first purchaser of Carrington's interest
in them.

Respondent insists that the decree obtained by complainant,
in the absence of all defence, confirming his purchase under the
trust sale, was inoperative and void as to respondent, he not
being a party thereto.    That decree being of no binding force
as to him, he insists that there is nothing in its terms to -com
mend it to the Court as an original measure of equitable relief.
That it should not be adopted: 1st, because, by the complain-
ant's own admission the sale confirmed was void: 2d, It was a
monstrous sacrifice of the property, as shown by the value put
upon it by complainant when he purchased of Rust the equity
of redemption, etc.: 3d, The slaves, *Peter* and *Iverson*, were not
in the possession, or under the control of the trustee, at the
time of the sale, but were then, and ever since, in the adverse
possession of another, holding under and for respondent, etc.

The cause was heard upon the original bill, amendment and
exhibits: the answer of Wood Bouldin, and exhibits, without
replication thereto, and upon an agreement of facts made by
counsel.

By this agreement, it is admitted that Robert Carrington,
when the mortgage and deed of trust were respectively execu-
ted, had two plantations, with slaves thereon engaged in plant-
ing, one known as the *Lost Prairie* plantation in Lafayette, and
the other as the *Caruse* plantation, in Hempstead county, about
20 miles apart.    That all the slaves mortgaged to Easely, were
employed and upon the *Caruse* plantation, from the date of the
mortgage until the winter of 1852–3.    That the deed of trust to
Fowlkes included all the slaves then employed on the *Lost*

*Prairie* plantation, together with *Peter* and *Iverson*, the slaves in controversy. That these two slaves were on the Caruse plantation in Hempstead county, and were not present, when the trustee, Hannah, made the sale under the deed of trust.

The Court dismissed the bill for want of equity.

In the meantime Fowlkes had died, and the cause had been revived in the name of Hannah as his administrator, who appealed to this Court.

1. It appears that Robert Carrington died in the spring, and not in the latter part of the year 1845, as alleged in the bill. The order of the Probate Court for the sale of his interest in the slaves mortgaged to Easely, was granted on the 22d of April, and the sale was made on the 23d of May, 1845; at the *Caruse* place, where the slaves were. Both the order and the sale appear to have been regular, and were authorized by Statute. *Dig. ch.* 4 *sec.* 164–5. At this sale, Bouldin purchased, and became the owner of " all the right, title and interest" which Carrington had, in and to the slaves embraced in the mortgage at the time of his death. *Ib.* What was such interest in the slaves *Peter* and *Iverson?* He had first mortgaged them to Easely. " The equity doctrine is, that the mortgage is a mere security for the debt, and only a chattel interest: and that until a decree of foreclosure, the mortgagor continues the real owner of the fee. The equity of redemption is considered to be the real and beneficial estate, tantamount to the fee at law, and is accordingly held to be descendible by inheritance, devisable by will, and alienable by deed, precisely as if it were an absolute estate of inheritance at law." 4 *Kent's Com.* 159. *Trapnall's adx. vs. State Bank*, present term.

Afterwards, Carrington made the deed of trust for the benefit of Fowlkes. By this deed, he conveyed the legal estate in the slaves to the trustees, charged with a prior incumbrance in favor of Easely. The legal estate was vested in the trustees for the purpose of enabling them to sell the property, and pass the title to the purchaser, without the necessity of resorting to equity to foreclose, in the event of Carrington's failure to pay the debt secured by the deed. But the conveyance was not absolute.

OF THE STATE OF ARKANSAS: **101**

TERM, 1856.]　　　　Hannah ad. vs. Carrington et al.

By its terms, it was made to secure a debt, and was to be void on the payment, by Carrington, of the debt, by the instalments, and at the times, recited in the deed. The payment of the debt by him, at the times stipulated, would have defeated the conveyance. If he had tendered the money, and it had been refused, he could have filed a bill, brought the money into Court, and enjoined the sale—in other words, redeemed the property. *Mayo vs. Judah*, 5 *Munf.* 495. *Wright vs. Henderson*, 12 *Texas R.* 44. *Marriott & Hurdesty et al. vs. Givens*, 8 *Ala. R.* 694. *Magee vs. Carpenter*, 4 *Ala.* 469. *P. & M. Bank of M. vs. Willis & Co.*, 5 *Ala.* 771. *Hawkins vs. May.* 8 *Ala.* 673. *Sims vs. Hundley*, 2 *How.* (*Miss.*) *R*, 896.

Whatever difference there may be, between a mortgage and a deed of trust in other respects, (see *Crittenden vs. Johnson*, 6 *Eng. R.* 94; *Pettit et al. vs. Johnson et al.*, 15 *Arh R.* 60) it is manifest that they agree in this, that the debtor has the right in equity to redeem the property, by paying or tendering the amount of the debt, at any time before foreclosure of the former, and sale under the latter. At the time, therefore, of Carrington's death, the title to the slaves had not passed absolutely out of him, but he had the right to redeem by discharging the two incumbrances upon them; and his administratrix, etc., succeeded to this right, and it existed down to the time that Bouldin purchased the equity of redemption.

No matter what the interest remaining in Carrington after the execution of the two instruments, may be technically called, it is beyond dispute that whatever interest he had, in law or equity, was purchased by Bouldin, at the sale made under the order of the Probate Court. It follows that Rust purchased no title at all in *Peter* and *Iverson* at the sale of Carrington's equity of redemption in the property embraced in the trust deed, this sale being subsequent to the one at which Bouldin purchased; and that Rust could, and did convey no title to Fowlkes in these slaves.

2. Fowlkes' title under the trust sale will next be considered.

He having caused a sale of the trust property to be made, under the provisions of the deed, and become the purchaser

thereof, and having, by bill in equity against the administratrix, and heirs of Carrington, obtained a decree confirming the sale, we must regard it as regular so far as they are concerned, who were parties to the bill. But Bouldin and Easely were not parties, and their rights were not affected in any way by the decree. Nor was any right, which Mrs. Carrington may have acquired under Bouldin, cut off or barred by the decree, because it was not within the scope of the bill—not put in issue by it. 1 *Greenleaf's Ev, sec.* 528–9.

Bouldin urges several objections to the validity of this sale.

The *first* objection is, that at the time the sale was made, the slaves, *Peter* and *Iverson*, were not present; were not under the control of the trustee, but were in the adverse possession of Bouldin, or his agent.

In *private sales* of personal property, it is not essential to the validity of the sale that the article sold should be present, or actually in the possession of the vendor at the time of the transfer. For example, if the subject of the sale be a horse, it may be running in the range: or, if a slave, he may be in the hands of a bailee of the vendor, and yet the legal title will pass to the vendee by the sale, because, in contemplation of law, the possession follows the title. But if at the time of the sale, the property is in the possession of one claiming adversely to the vendor, the legal title does not vest in the vendee, because the right of the vendor to the property is a *chose in action*, which is not assignable by the common law. See *Stedman vs. Riddick*, 4 *Hawks* (*N. C.*) *R.* 29. *Goodwyn vs. Lloyd* 8 *Porter* 237 *Foster vs. Garee* 5 *Ala. R.* 427. *O'Keefe vs. Kellogg*, 15 *Illinois R.* 347. *McGoon vs. Ankeny*, 11 *Ib.* 558. *Stogdell vs. Fugate*, 2 *A. K. Marsh.* 136.

It has been held that in *judicial sales* of personal property, the property should be present, and pointed out by the officer to the bidders, otherwise the sale will not be valid. *Cresson vs. Stout*, 17 *Johnson R.* 116; *Sheldon vs. Soper*, 14 *Ib.* 353. *Jackson vs. Striker*, 1 *Johnson's cases* 287. *Linnendoll vs. Doe*, 14 *John. R.* 222. *Bostick vs. Keizer*, 4 *J. J. Marshall's Rep.* 597. But it is said that this restriction is intended for the benefit of the owner,

and he may waive the actual presence of the property. *Gift vs. Anderson*, 5 *Humph. R.* 577. If, however, the property, at the time of the sale, is in the possession of a person claiming to hold it by a title adverse to that of the defendant in the execution, it has been held that the legal title would not pass to the purchaser, because the right of the defendant in the execution to the property, is but a chose in action, which is not the subject of execution by the common law. *Bostick vs. Keizer*, 4 *J. J. Marsh.* 597.

In *trust sales*, like the one under consideration, no doubt but the property should be present when sold. It is to the interest both of the maker of the trust, and the *cestui que trust*, that it should bring a fair price—other creditors may also have an interest in the matter. It seems, however, that a stranger to the trust has no right to object that the property was not actually present at the sale. But, as in the other classes of sales, if at the time of the sale the property is in the hands of one claiming it by an adverse title, the legal title will not vest in the purchaser so as to enable him to maintain an action therefor in his own name, for the reason that the subject of the sale is but a *chose in action*, *Herbert vs. Henrick*, 16 *Ala R.* 599. *Gary vs. Colgin*, 11 *Ala.* 514—519. *Foster vs. Garee*, 5 *Ib.* 425. *Brown vs. Lipscomb*, 9 *Porter* 472. *Bostick vs. Keizer.* 5 *J. J. Marsh.* 597. *Hundley vs. Buckner*, 6 *Sm. & M.* 77.

This principle seems to apply to all three of the classes of sales which we have been considering.

How far, and under what circumstances, a Court of equity would protect, or enforce the claim of the purchaser, is another question.

In this case, the answer of Bouldin avers that he held the slaves adversely at the time of the trust sale. He had purchased Carrington's equity of redemption in them, and had, as he insists, become subrogated to the rights of Easely under the mortgage, which was prior to the trust deed, to the extent that he had paid the mortgage debt.

It is clear that the trustee had no right to the possession of the slaves at the time of the sale, the senior incumbrance not

being discharged, He could not have recovered them by an action at law for the purpose of selling them. Manifestly, the proper course for Fowlkes to have pursued, would have been to cause the trustee to expose to a fair sale all the property embraced in the trust, except the two slaves included in the mortgage, first, and if it was not sufficient to satisfy his debt, then to have filed a bill against Bouldin and Easely for the purpose of subjecting *Peter* and *Iverson*, by compelling them to foreclose their mortgage, and resort first to the other property embraced therein. *Given's ad. vs. Davenport*, 8 *Texas R.* 451. *Hall and wife vs. Harris et al.*, 11 *Texas* 300. Or, there being doubts about the power of the surviving trustee to sell any of the property, Fowlkes might have resorted to equity to close up the entire trust. *Sullivan vs. Hadley* 16 *Ark.; Walton et al. vs. Cody* 1 *Wisconsin R.* 420. *Wright vs. Hendersou,* 7 *How. Miss. R.* 569.

The *second* objection to the validity of the trust sale is, that the power of sale was vested by the deed of trust jointly in two trustees, and that one of them being dead, the power did not survive to the living one—that he could not execute the trust. This is not a valid objection. Joint trustees are not within the reason of the Statute, (*Digest ch. 92, sec. 6,*) abolishing survivorships. It is a well settled rule of the law, that if a power coupled with a trust be given to two or more, it may be executed by one who has survived the others. *Parsons vs. Boyd*, 20 *Ala.* 118. *Hawkins vs. May*, 12 *Ib.* 672. *Taylor vs. Benham*, 5 *How. U. S. R.* 233. *Peter vs. Beverly*, 10 *Peter's R.* 532. *Franklin vs. Osgood*, 14 *John. R.* 527.

The *third objection* to the validity of the sale, that the power of the trustee was not coupled with an interest, and therefore was revoked by the death of Carrington, is likewise untenable. After Barrington executed the deed, he could not have revoked it himself while living, and his death would hardly recall a power, which had passed beyond his control.

A power of sale in a mortgage falls under the class of powers appendant or annexed to the estate: and they are powers coupled with an interest, and are irrevocable, and demand part of

the mortgage security, etc.    4 *Kent's Com.* 148.    In a deed of trust the power of sale is coupled with the legal estate, and, also, with a trust for the benefit of the *cestui que trust.*

There is a *fourth objection* to Fowlkes' title, under the trust sale, apparent on the face of the record before us.    The deed of trust seems to have been recorded in Lafayette county, but at what time does not appear from the recorder's certificate. At the time of the execution of the deed, and from thence forward until his death, Carrington resided in Hempstead county: and the slaves, *Peter* and *Iverson* were on the *Caruse* plantation in the same county.    There is no allegation in the bill, or showing of record, that the trust deed was ever recorded in Hempstead.

The Statute provides that "*all mortgages*" upon lands shall be recorded in the counties where the lands lie: and *mortgages* upon personal property, in the county in which the *mortgagor resides:* and that every mortgage, whether for real or personal property, shall be a *lien* on the mortgaged *property* from the time the same is filed in the Recorder's office for record, *and not before,* etc.    *Digest ch.* 110, *sec.* 1–2.

A mortgage not acknowledged, or proven, and recorded as required by the Statute, though good between the parties to it, is not valid as against subsequent purchasers, or incumbrancers, of the subject of the mortgage.    *Main et al. vs. Alexander*, 4 *Eng. R.* 112.

Does the term "*mortgage*," used in the Statute, embrace deeds of trust?

Mr. KENT defines a *mortgage*, thus: " A mortgage is the conveyance of an estate, by way of pledge for the security of debt, and to become void on payment of it.    The legal ownership is vested in the creditor: but, in equity, the mortgagor remains the actual owner, until he is debarred by his own default, or by judicial decree."    4 *Com.* 136.    The definition of Mr. COOTE is substantially the same.    *Coote on Mortgages*, 1.

Again, says Mr. Kent: " It is usual to add to the *mortgage*, a *power of sale* in case of default, which enables the mortgagee to obtain relief in a prompt and easy manner, without the ex-

pense, trouble, formality and delay of foreclosure by a bill in equity." 4 *Com.* 146.

The instrument under consideration falls fully within Mr. KENT's definition of a *mortgage* with a power of sale. Upon its face, it purports to be a security for a debt, to become void on payment: the grantor remained in possession: on default of payment, the trustees were to sell sufficient property to pay the debt only, and any excess of property, or of the proceeds of the sale, that might remain after paying the debt, belonged to the grantor. The character of the instrument is the same, whether the power of sale be vested in the mortgagee, or a third person as trustee.

The counsel on both sides of this case agree that the deed of trust is but a *mortgage* with a power of sale, and so the Courts have generally regarded such instruments—though they differ, in some respects, from mortgages without such power. See *Wright vs. Henderson*, 12 *Texas R.* 44. *Byron vs. May.* 2 *Chandler R.* 103. *Walton vs. Cody et al.* 1 *Wisconsin R.* 420. *Marriott et al. vs. Givens*, 8 *Ala. R.* 694. *Planter's and Merchant's Bank of Mobile vs. Willis & Co.*, 5 *Ala. R.* 791. *Sims vs. Hundley*, 2 *How. Miss. R.* 896. (*Smede's Digest p.* 410.)

If therefore the term "*mortgage*," as used in the Statute, embraces *deeds of trust*, and we see no good reason why it does not, it follows that Bouldin purchased the slaves in question discharged of any lien of the trust deed, and as against *Fowlkes* acquired a perfect title to them.

Sustaining this objection to *Fowlkes'* title would dispose of the whole case, but it may be well to look further into his right to the relief sought by the bill, on the supposition that the term "*mortgage*" as used in the Registry act, was not intended to embrace deeds of trust like the one under consideration.

As above shown, he cannot be regarded as having purchased the legal title to the slaves *Peter* and *Iverson* at the trust sale. Did he purchase such an equitable title as a Court of chancery should protect and confirm as against Bouldin? There is nothing in the bill or exhibits to show that the other slaves and lands embraced in the deed were first exposed to sale, and

failed to satisfy the trust debt. Indeeed, it is to be inferred from the conveyance from the trustee to Fowlkes, that the whole of the property was put up at once in a body, and bid off for Fowlkes, at the sum of $15,000. This mode of sale was unfair, and contrary to the provisions of the deed, which manifestly contemplated a sale of so much of the property only, as should be found necessary to discharge the debt: and whether less than the whole was sufficient for that purpose or not, could only be fairly ascertained by offering it in such lots or parcels as would suit the convenience of bidders, and comport with the character of the property to be sold.

At best, therefore, upon the record before us, we cannot regard Fowlkes as having any claim to the two slaves in question other than that of a *cestui que trust* in an incumbrance junior to the mortgage.

3d. It may now be enquired what equitable right Fowlkes has to claim that the two slaves in question shall be subjected, in the hands of Bouldin, to a further satisfaction of his debt? There is no allegation in the bill, that the other property purchased by him at the trust sale, was of less value than the amount of his debt. The answer of Bouldin avers that it was worth greatly more than the debt. This is an affirmative allegation, but not being denied by replication, it must be taken as true. *Walton vs. Cody*, 1 *Wisconsin R.* 427.

Moreover, Bouldin assumes in his answer, that the value which Fowlkes put upon the property, is to be inferred from the price he paid Rust for the equity of redemption, purchased by him at the sale under the order of the Probate Court. That he estimated its value at over $8,000 more than his debt. The counsel for Fowlkes pronounces this an "egregious sophism." We cannot so regard it. If Fowlkes desired merely to make his debt, and not to speculate upon the property, a fair legal sale under the trust deed, would have cut off Rust's title by relation back to the date of the deed. Fowlkes could have bid the amount of his debt upon the property, and if no one would have given more, he would have obtained it for his debt. But

if others would have given more, his debt would have been paid out of the proceeds of the sale.

But he chose rather to give Rust over $8,000 for his title, and then, it is to be inferred from the record before us, caused the whole of the property to be exposed to sale by the trustee, in a *lump*, thereby lessening the chances for competing bidders, and purchased it in for about the amount of his debt.

Under these circumstances, we do not think that his claim upon a Court of equity for further relief is well founded.

Bouldin being the owner of the equity of redemption of the mortgaged property, when he pays off the remainder of Easely's debt, whether the mortgage will be thereby entirely extinguished, and his title to the property will become perfect and absolute, or whether he will be merely subrogated to the rights of Easely, and hold, in any sense, or for any purpose, as mortgagee, are questions discussed by counsel, but we do not deem it necessary now to decide them. Upon the case made for Fowlkes; his representatives are not interested in the determination of these questions.

We have regarded Bouldin as the contesting party in this case, because by his contract with Mrs. Carrington, she was not to obtain title to the property until Easely's debt was paid, and she had refunded to Bouldin all sums advanced by him in discharging the debt: and his answer shows that she is still in arrear. It was, however, measurably by the proceeds of her industry and labor that Easely's debt was discharged *pro tanto*, and we have not failed to consider her ultimate equitable rights in the premises, in passing upon the claim of Fowlkes to a further satisfaction of his debt out of the slaves in controversy.

The decree of the Court below is affirmed.

Absent, Hon. T. B. HANLY.