CROWELL ET AL vs YOUNG ET AL.

Opinion delivered September 25, 1902.

1.  *Indian Lands—Improvements—Sales—Mortgages—Foreclosure.*

Under Const. Cher. Nat. Art. 1, Sec. 2, and under Cher. Laws, 1892, p. 351, a sale of land or improvements thereon by a Cherokee to a citizen of the United States is void.   But in a court of equity, where suit is brought for the foreclosure of a mortgage on improvements upon Indian lands, the execution of the mortgage will not be considered a sale, and the same may be regularly foreclosed.

2.  *Indian Lands—Improvements—Mortgages—Foreclosure—Jurisdiction.*

Act of Cong. May 2, 1890 Sec. 31 provides that executions on judgments obtained in any other than Indian courts shall not be valid for the sale or conveyance of title to improvements made upon Indian lands, *Held,* to apply to sales under decrees in chancery as well as judgments at law, also, *Held,* to be repealed by Act of Cong. June 7, 1897 (30 Stat. 83) except as to the Choctaw and  Chickasaw Nations.   And, *Held,* that except as to Choctaw and Chickasaw Nations, the U. S. Courts in Indian Territory have jurisdiction of actions to foreclose mortgages on improvements, on Indian lands, executed by Indian citizens to United States citizens, and to enforce the decree by sale, subject only to the  limitation  of the Cherokee Constitution  that none but Indians can be a purchaser of such improvements at such sale.

On petition for rehearing.   Opinion modified.

For former hearing, see (p.      herein).

CLAYTON J.   At our last January term we handed down an opinion in this cause.   A motion for a rehearing was filed within the time prescribed by the statute.   At our last June term the motion, together with an argument upon the whole case, was submitted, with the understanding that, if the motion were sus-

tained, the case was to be considered as submitted to be decided at this term. The motion is sustained, and the decision then made is set aside, and the opinion then handed down is modified to read as follows:

The appellants' complaint in equity alleges that the defendants (appellees here) and plaintiff Crowell are Cherokee Indians, and that the plaintiff Blevins is a citizen of the United States; that on the 13th day of September, 1895, the defendants, being indebted to plaintiffs in the sum of $1,677.50, executed to plaintiffs their promissory note for that sum, and upon the same day, to secure the payment of said note, and another indebtedness of $100 upon account, they executed to plaintiffs a mortgage upon a certain farm and improvements and personal property, all located and being in the Cherokee Nation; that the amount due has, by payments and credits, been reduced to the sum of $863.50, with interest thereon from April 19, 1898, at 10 per centum per annum; and that defendants are insolvent. The prayer of the bill is: First, for judgment against defendants for the amount due, with interest; second, that a receiver be appointed to take charge of the mortgaged premises during the pendency of the suit; and, third, that the interest of the defendants in the premises be sold, etc. To the complaint the defendants filed a demurrer, setting up the following grounds: "(1) That the said complaint does not state facts sufficient to constitute a cause of action; and (2) that the said complaint does not state facts sufficient to entitle the plaintiffs to any relief in equity." The court sustained the demurrer, and, the plaintiffs refusing to plead further, entered judgment for defendants. To the sustaining of the demurrer and the entering of judgment for defendants, the plaintiffs saved their exceptions, and duly appealed to this court.

The court below entertained the opinion that a Cherokee Indian could not execute a valid mortgage to a citizen of the United States upon his premises located in the Cherokee Nation,

and, as the plaintiff Blevins, one of the mortgagees named in the mortgage, was a white man, held, therefore, the mortgage to be void; and this is the only question of dispute in the case. The constitution of the Cherokee Nation provides: "The lands of the Cherokee Nation shall remain common property; but the improvements made thereon, and in the possession of the citizens of the nation, are the exclusive and indefeasible property of the citizens respectively who made them, or may rightfully be in possession of them: provided, that the citizens of the nation possessing exclusive and indefeasible right to their improvements, as expressed in this article, shall possess no right or power to dispose of their improvements in any manner whatever, to the United States, individual states, or to individual citizens thereof." Const. Cher. Nat. art. 1, § 2. The Cherokee statute provides that. "It shall not be lawful for any citizen of the Cherokee Nation to sell any farm or other improvement in said nation to any other person than a bona fide citizen thereof; nor shall it be lawful to rent any farm or other improvement in this nation to any person other than a citizen of the Indian Territory; and every person who shall offend herein shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall suffer punishment by fine in any sum not less than ten dollars nor exceeding five hundred dollars, or in default of payment, by imprisonment for any term not exceeding one year." Cher. Laws 1892, p. 351. Act Cong. May 2, 1890, § 29 (26 Stat. 81, 95; Ind. T. Ann. St. 1899, pp. 7, 8), provides that the United States Courts in the Indian Territory shall have jurisdiction of "all cases of contracts entered into by a citizen of any tribe or nation with citizens of the United States, in good faith and for a valuable consideration, and in accordance with the laws of such tribe or nation, and such contracts shall be deemed valid and enforceable by such courts." There is no doubt but that by the Cherokee constitution and statute a sale of or lease of land, or improvements on the same, by a Cherokee to a citizen of the United States, is not in accordance with the laws of

such tribe, and therefore, under the statute of May 2, 1890, above set out, cannot be enforced by our courts. Such contracts are void. And if a mortgage executed by a Cherokee citizen to a citizen of the United States, and placed upon such lands or improvements, is to be considered as a sale of such lands to the mortgagee, it is void. But in a court of equity, in which tribunal this suit was brought, is a mortgage a sale to the mortgagee? It is conceded that in a court of law it would be considered a conveyance of a defeasible estate, but in equity it is only deemed to have the effect of a lien. Mr. Tiedeman, in his work on Real Property (section 300), says: "As a result of this equitable jurisdiction, mortgages assumed in equity a different character from what they had in law. Equity seized hold of the real intention of the parties, and construed the mortgage to have only the effect of a lien, instead of vesting a defeasible estate in the land. This equitable construction conforms more nearly to the purposes and desired effect of a mortgage. It is given only to secure the payment of a debt or the performance of some obligation, and its ends are satisfied if, after condition broken, means are provided to the mortgagee for satisfying his claim by an appropriation of the land, while in the interim his interests are protected against any subsequent conveyance of the land. All this is attained by a lien. Equity therefore held the mortgage to be a lien upon the land, and not an estate in it." See Hannah vs Carrington, 18 Ark. 85, and other authorities cited in note 1. Mr. Kent, in his fourth volume of his Commentaries (page 160), says: "The equity doctrine is that the mortgage is a mere security for the debt, and only a chattel interest, and that until a decree of foreclosure the mortgagor continues the real owner of the fee. The equity of redemption is considered to be the real and beneficial estate, tantamount to the fee at law; and it is accordingly held to be descendible by inheritance, devisable by will, and alienable by deed, precisely as if it were an absolute estate of inheritance at law." And this is the undoubted rule in equity. And therefore,

by the law of the tribunal in which this case was tried, the execution of the mortgage was not a sale, and not in violation of the laws of the Cherokee Nation; and after foreclosure, when the premises are to be sold, none but Cherokees can bid, because none but Cherokees can lawfully buy; none other could take title; and the commissioner's deed, confirmed by the court, would be executed to a Cherokee buyer, who would take title; and so, from the beginning to the end, the very letter as well as the spirit of the Cherokee law would be held inviolable.

But we are confronted with the act of congress of May 2, 1890, entitled "An act to provide a temporary government for the territory of Oklahoma, to enlarge the jurisdiction of the United States Court in the Indian Territory, and for other purposes," the thirty-first section of which, among other things, provides: "That executions upon judgments obtained in any other than Indian courts shall not be valid for the sale or conveyance of title to improvements made upon lands owned by an Indian nation, except in cases wherein attachments are provided for." 26 Stat. 94 (Ind. T. Ann. St. 1899, p. 9). This provision applies to improvements of Indians by blood, erected upon lands the title to which is in the Indian tribe. And when the evident purpose of the act is taken into consideration,—that is, that improvements erected by such Indians on Indian lands were to be sold by judicial sale only under the judgments of their own courts,—it must be conceded it applies as well to sales under decrees in chancery as to judgments at law; that is, that the word "judgment" is used in the statute in its comprehensive sense, embracing not only judgments at law, but also definitive decrees and orders in the nature of judgments, decreeing the sale of Indian improvements so situated. See And. Law Dict. tit. "Judgments." And therefore, in this case, the improvements sought to be subjected to sale by the decree of the court having been erected by and being the property of Indians, and erected on Indian lands, can no more be condemned to sale under the decree of the

court because of the fact that in the forum the mortgage is but a lien, than if it were a sale; not because of the fact that the contract was in violation of the Cherokee constitution and laws, but because of the fact that the laws of the United States deny jurisdiction to its courts to enforce, by a sale of the mortgaged premises, such contracts.   But it is now suggested that by virtue of the act of congress of June 7, 1897, that part of the act of May 2, 1890, above set out is no longer in force in the Cherokee Nation, in so far as it prohibits the Courts of the United States from condemning to judicial sale improvements erected and owned by Indians of the blood on Indian lands; and upon further consideration we are of the opinion that this is correct.   The act of June 7, 1897 (30 Stat. 83), is as follows:   "That on and after January 1, 1898, the United States Courts in the Indian Territory shall have original and exclusive jurisdiction and authority to try and determine all civil cases in law and equity thereafter instituted;   *   * and the laws of the United States and the state of Arkansas in force in the territory shall apply to all persons therein, irrespective of race, said courts exercising jurisdiction thereof as now conferred upon them in the trial of like causes."   This act unquestionably took from the courts of the different Indian nations in the Indian Territory jurisdiction of all cases, civil and criminal, and conferred upon the United States Courts in said territory full and exclusive original jurisdiction of all causes arising within the territory; and as, under the act of May 2, 1890, the Indian courts had the sole and exclusive jurisdiction to order the sale of improvements on Indian lands owned by Indians by blood, and as this jurisdiction, by the act of June 7, 1897, was transferred to the United States Courts, it follows that these courts now have that jurisdiction,—that is to say, that the act of May 2, 1890, did not deprive an Indian owning an improvement on Indian lands from executing a mortgage upon it; and, if the mortgagee were an Indian, either by blood or adoption (for both had an equal standing before the Indian courts), he could go into that court, and en-

force his mortgage, and obtain an order of sale to satisfy the debt. If the mortgagee were a white man, he could not foreclose his mortgage at all, because the Indian courts had no jurisdiction over his person, and the statute forbade the United States Courts to take jurisdiction of the subject-matter. As to the Indian mortgagee, whether he be an Indian by blood or adoption, it is clear that the mortgage gave to him a right of action, if the conditions were broken, to be enforced in the Indian courts; and that right still exists; no longer, however, to be enforced by the Indian court, but by the act of June 7, 1897, to be enforced by the United States Courts. Under the law as it stood prior to June 7, 1897, an Indian by blood could mortgage his improvements. They could only be sold, however, by a decree of an Indian court. An Indian by adoption could also mortgage his improvements, and the foreclosure could be had and sale ordered by the Indian court if the mortgagee were an Indian, and by the United States Courts if the mortgagee were a white man. A white man, being the owner of improvements on Indian lands, could mortgage, and, no matter who the mortgagee might be, the foreclosure proceedings and order of sale would be had in the United States Court. And thus it will be seen that all persons having improvements on Indian lands might mortgage them, and they could be sold to satisfy the mortgage debt, except in the single instance where an Indian by blood should have undertaken to execute a mortgage upon them to a white man. The act of May 2, 1890, in such case took away the jurisdiction of the United States Court that it theretofore had to foreclose the mortgage and condemn the improvements to sale. By the sixth section of the act of March 1, 1889, entitled "An act to establish a court in the Indian Territory and for other purposes" (25 Stat. 783; Ind. T. Ann. St. 1899, p. 2,) it is provided: "That the court hereby established shall have jurisdiction in all civil cases between citizens of the United States who are residents of the Indian Territory, or between citizens of the United States, or of any state or territory therein, and any

citizen of or any person or persons residing or found in the Indian Territory, and when the value of the thing in controversy, or damages or money claimed shall amount to one hundred dollars or more: provided, that nothing herein contained shall be so construed as to give the jurisdiction over controversies between persons of Indian blood only.   "When it is remembered that the Cherokee constitution, above set out, while retaining title to its lands, gave to each citizen of that nation who had made improvements on the lands the exclusive and indefeasible property, and the right of possession of them, and the further right to alienate such improvements to Cherokee Indians, it must be conceded, we think, that from the organization of the courts in the Indian Territory under the said act of March 1, 1889, up to the passage of the act of May 2, 1890, that a mortgage executed by an Indian by blood to a white man on his improvement could have been enforced in the United States Courts so long as the purchaser at the sale should be by the order confined to Indians.   This, as has been shown, would not be in conflict with the constitution and laws of the Cherokee Nation, and would be in harmony with the statute which gave to the courts of the United States jurisdiction to try every cause of action where a white man was one of the parties to it.   The statute of May 2, 1890, however, took from the United States Courts this jurisdiction, and, as the Cherokee Courts had no jurisdiction over a suit of a white man, whether he was plaintiff or defendant, there was, therefore, after the passage of that act, no court into which the white man could go to enforce his right.   The doors of the courts were closed against him, and he was left without a remedy.   But the statute of June 7, 1897, not only had the effect of annihilating the Indian Courts by taking from them all jurisdiction, but it conferred upon the United States Courts in the Indian Territory "original and exclusive jurisdiction and authority to try and determine all civil causes in law and equity thereafter instituted," and the laws of the United States and the state of Arkansas were made applicable

to all persons therein, irrespective of race.   This act, we think, and so hold, had the effect, not only of giving to the United States Courts jurisdiction over controversies between Indians, but of restoring to them the jurisdiction taken away from them by the act of May 2, 1890, leaving them now clothed with full original jurisdiction to enforce by sale a decree foreclosing a mortgage upon improvements on Indian lands, whether they be owned by a white man, an Indian by adoption, or an Indian by blood, provided, always, that the purchaser at the sale be restricted to an Indian of the tribe.   And this is not in conflict with our opinion in Hampton vs Mays and Williams, handed down at the present term.   The facts upon which that case was founded arose and existed in the Chickasaw Nation.   The Atoka agreement, passed June 8, 1898, had the effect of restoring to the courts of the Choctaw and Chickasaw Nations the jurisdiction that had been taken away from them by the act of June 7, 1897, leaving them and the courts of the United States exercising jurisdiction in those two nations with the same jurisdiction that they possessed before the passage of that act.   And therefore in those two nations the United States Courts have no jurisdiction to decree judicial sales of improvements owned by Indians by blood.

The decree of the court below is reversed.