## EVANS-SNIDER-BUEL CO. et al. v. McFADDEN et al.

(Circuit Court of Appeals, Eighth Circuit. November 19, 1900.)

No. 1,403.

1. CONSTITUTIONAL LAW—IMPAIRING OBLIGATION OF CONTRACTS—ACTS OF CONGRESS.
The constitutional inhibition against the passage of laws impairing the obligation of contracts is a limitation upon the powers of the states, but not upon those of congress.
2. SAME—CONTRACTS PROTECTED—JUDGMENTS.
A judgment is not a contract in such sense that it is protected by the provision of the federal constitution against laws impairing its obligation.
3. SAME—VESTED RIGHTS—ATTACHMENT LIENS.
Remedies, and those rights pertaining to the remedy, which are purely of statutory creation, may be altered or abolished even after an action is instituted, provided an adequate remedy remains for the enforcement of rights founded on contract; and congress, which is not prohibited from passing retrospective or retroactive laws, has power to devest or impair

an attachment lien acquired under a federal statute, at least until there has been an adjudication that adequate grounds for the attachment exist, and that the lien of the attachment be enforced.

4. SAME—RETROSPECTIVE STATUTE—ACT VALIDATING MORTGAGES.

Act Feb. 3, 1897 (29 Stat. 510, c. 136), amending Mansf. Dig. § 4742, as in force in the Indian Territory, provides that, where the mortgagor of personal property in the territory is a nonresident, the mortgage shall be recorded in the judicial district in which the property is situated, and that "all mortgages of personal property in the Indian Territory heretofore executed and recorded in the judicial district thereof in which the property was situated at the time they were executed are hereby validated." At the time of the passage of such act property covered by a mortgage which had been recorded as therein prescribed had been levied on by an attaching creditor of the mortgagor who had also taken judgment by default against the defendant, but the mortgagee had intervened in the action, claiming the property, and the issues between him and the plaintiff had not been tried or determined. *Held,* that the act, as retrospectively applied to the mortgage involved in the suit, was not unconstitutional, as depriving the attaching creditor of his property without due process of law, since there had been no adjudication which gave him a vested right to subject the property to the payment of his debt, as against the mortgagee, which constituted "property" within the meaning of the constitution, but the question of such right was pending in the suit and undetermined.

5. SAME—CONSTRUCTION OF LEGISLATIVE POWERS—EQUITABLE CONSIDERATIONS.

In determining whether a curative act intended to validate existing mortgages is in violation of vested rights and unconstitutional as against attaching creditors of a mortgagor, the courts may properly consider the equities of the parties affected; and, where the act is clearly in the interests of justice, and was designed and operates to protect the parties having the highest equitable rights, they should construe the legislative powers liberally to uphold it.

Sanborn, Circuit Judge, dissenting.

In Error to the United States Court of Appeals in the Indian Territory.

The record in this case discloses the following facts, in the light of which it is to be determined: On June 17, 1896, the Evans-Snider-Buel Company, the principal plaintiff in error, held two deeds of trust in the nature of mortgages, one dated April 23, 1896, and the other May 19, 1896, covering about 6,775 head of cattle, which deeds of trust had been executed by John R. Blocker, who was at the time a resident and citizen of Bexar county, state of Texas. The cattle described and covered by the two deeds of trust were at the time in pasture near the town of Muscogee, in the Creek Nation of the Indian Territory. The deeds of trust were given to secure the payment of notes executed by John R. Blocker to the amount of about $130,000, which were held at the time by the Evans-Snider-Buel Company, and represented money that had been advanced by that company to Blocker to enable him to purchase the cattle in controversy. The testimony shows without any contradiction that Blocker had not advanced any money of his own to purchase the cattle, but that they had been acquired with funds furnished for that purpose by the Evans-Snider-Buel Company. Both deeds of trust were filed for record and were recorded, within a day or two after their execution, in the clerk's office of the United States court for the Northern district of the Indian Territory, that being the district in which the mortgaged property was located. One of the mortgages—being the one that was first executed to secure notes to the amount of $122,184.60—was also recorded, the day after it was executed, in Bexar county, Tex., where the mortgagor resided. On June 17, 1896, William McFadden & Son, the defendants in error, commenced a suit by attachment against John R. Blocker in the United States court for the Northern district of the Indian Territory upon a judgment in the sum of $55,875.71, which the attaching creditors had recovered against John R. Blocker in Jefferson county, Tex., on May 26, 1887. On June 29,

1896, they caused the writ of attachment in that suit to be levied on the cattle covered by the aforesaid deeds of trust, which were then in pasture near Muscogee, in the Indian Territory. At the time of directing the levy of the writ of attachment, McFadden & Son were aware of the existence of the two deeds of trust aforesaid, they having obtained a description of the cattle on which they directed the levy to be made by examining the description contained in said deeds of trust as then recorded in the Indian Territory. On July 14, 1896, the Evans-Snider-Buel Company gave bond as interpleader in the cause in the sum of $150,000, and, having given such bond in accordance with law, was permitted to retain possession of the attached cattle. The writ issued in the attachment suit was returnable on the 3d day of December, 1896, and at the return term of the writ, to wit, on January 27, 1897, the Evans-Snider-Buel Company filed its interplea in due form, asserting therein that the cattle were not subject to seizure and sale as the property of John R. Blocker, but were its property. Two days later, to wit, January 29, 1897, judgment by default in the sum of $55,875.71 was rendered against J. R. Blocker in the attachment suit, he having failed to make answer to the complaint. Subsequently the issue arising on the interplea in the case as between the Evans-Snider-Buel Company and William McFadden & Son was twice tried, and resulted on each occasion in a verdict in favor of the interpleader and against the attaching creditor, which judgments, however, were in each instance reversed on appeal by the United States court of appeals in the Indian Territory. The opinion of that court on the first appeal is reported in 48 S. W. 1043. On the last reversal the United States court of appeals in the Indian Territory rendered a judgment in favor of the attaching creditors and against the interpleader and the sureties on its bond in the sum of $72,250.35. The interpleader has brought the case to this court for review.

U. M. Rose and H. M. Pollard (C. B. Stuart, W. E. Hemingway, and G. B. Rose, on the brief), for plaintiffs in error.

W. T. Hutchings and N. B. Maxey (J. B. Clayton, on the brief), for defendants in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Among the numerous chapters of Mansfield's Digest of the Laws of Arkansas which were extended over and put in force in the Indian Territory by the act of congress of May 2, 1890 (26 Stat. 81, 95, c. 182), was chapter 110, entitled "Mortgages," which chapter contains, among others, the following sections:

"Sec. 4742. All mortgages, whether for real or personal estate, shall be proved or acknowledged in the same manner that deeds for the conveyance of real estate are now required by law to be proved or acknowledged; and when so proved or acknowledged shall be recorded—if for lands, in the county or counties in which the lands lie, and, if for personal property, in the county in which the mortgagor resides.

"Sec. 4743. Every mortgage, whether for real or personal property, shall be a lien on the mortgaged property from the time the same is filed in the recorder's office for record, and not before; which filing shall be notice to all persons of the existence of such mortgage."

Prior to the adoption of the chapter concerning mortgages as the law of the Indian Territory, it had been decided by the supreme court of Arkansas in Main v. Alexander, 9 Ark. 112, that by force of the aforesaid sections a mortgage on personal property executed in that state was good as between the parties thereto, though not acknowledged and recorded; but that it constitutes no lien upon the

mortgaged property as against strangers until it is acknowledged and recorded in the mode prescribed by the statute, although they have actual notice of its existence. The doctrine last stated had been recognized and enforced in the state of Arkansas in several other cases prior to May 2, 1890, but in some cases—notably in Mitchell v. Wade, 39 Ark. 377, 386, Martin v. Ogden, 41 Ark. 186, 192, and in Ford v. Burks, 37 Ark. 91, 94—it had been criticised as harsh and unjust, and not in harmony with equitable principles as they prevail elsewhere. It had also been decided as early as 1886 in Watson v. Lumber·Co., 49 Ark. 83, 4 S. W. 62, that a foreign corporation, not being a resident of that state, could not execute a mortgage on personal property located in that state which it owned, and, by placing it of record, create a lien which would be good as against strangers. In Main v. Alexander the controversy arose between a mortgagee whose mortgage was recorded, but not properly acknowledged, and a creditor of the mortgagor, who had attached the mortgaged property subsequent to the execution and record of the mortgage; and it was decided that the lien of the attaching creditor was paramount. In the case of Watson v. Lumber Co. the controversy arose between a mortgagee who held a mortgage executed by a foreign corporation that was recorded in the county where the property was situated and certain judgment creditors of the mortgagor company who had caused executions to be levied on the mortgaged property subsequent to the execution and recording of the mortgage, and it was held that the lien of the judgment creditors was paramount to that of the mortgagee. On February 3, 1897 (29 Stat. 510, c. 136), congress passed an act to the following effect:

"That section forty-seven hundred and forty-two of Mansfield's Digest· of the Laws of Arkansas, heretofore put in force in the Indian Territory, is hereby amended by adding to said section the following: 'Provided, that if the mortgagor is a non-resident of the Indian Territory the mortgage shall be recorded in the judicial district in which the property is situated at the time the mortgage is executed. All mortgages of personal property in the Indian Territory heretofore executed and recorded in the judicial district thereof in which the property was situated at the time they were executed are hereby validated.' "

As this statute in express terms validated all mortgages theretofore made by nonresidents of the Indian Territory on personal property there located which had been recorded in the judicial district where the property was situated, and therefore embraced and validated the two mortgages that had been executed by J. R. Blocker in favor of the Evans-Snider-Buel Company, one of the principal questions discussed before this court concerns the power of congress to enact the statute aforesaid, and give to it such retrospective operation. It will be observed that William McFadden & Son, hereafter referred to as the attaching creditors, caused the writ of attachment in the action brought by them against J. R. Blocker, the mortgagor, to be levied on the cattle that were conveyed by the mortgage, about seven months before the act of congress validating the mortgage was approved; also that the judgment by default was entered in that case against the attached debtor five days before the law was enacted. But when the act was approved the interplea of the

Evans-Snider-Buel Company in the attachment suit was still pend-
ing and undetermined, as well as when the judgment by default was
taken, and no trial of the issue existing between the interpleader
and the attaching creditors was had until several months thereafter,
to wit, on April 20, 1897.

We deem it wholly unnecessary to indulge in any extended dis-
cussion of the question which has been mooted whether the act of
congress aforesaid impairs the obligation of a contract, and is for
that reason void—First, because the inhibition against the exercise
of such a power which is contained in section 10. art. 1, of the fed-
eral constitution, is not addressed to the national legislature, but
to the legislatures of the several states (Mitchell v. Clark, 110 U. S.
633, 643, 4 Sup. Ct. 170, 28 L. Ed. 279; Legal Tender Cases, 12 Wall.
457, 20 L. Ed. 287; Beach, Mod. Cont. § 1633); and, second, because
no contract is disclosed by the record which the act of congress
in question operates to impair. It is true that the attaching cred-
itors have a judgment against J. R. Blocker, and that judgments are
sometimes termed "contracts of record"; but such general state-
ments mean only that the law will imply a promise on the part of
a judgment debtor to pay a judgment that has been recovered against
him, and that he may be sued in form ex contractu on such implied
promise. A contract of that nature, however, which does not rest
on the mutual assent of the parties thereto, but is forced upon the
judgment debtor as the result of a legal implication, is not such a
contract as the federal constitution was intended to protect against
legislation tending to impair its obligation. This proposition is well
established by controlling authority. Louisiana v. Mayor, etc., of
City of New Orleans, 109 U. S. 285, 288, 3. Sup. Ct. 211, 27 L. Ed.
936; Garrison v. City of New York, 21 Wall. 196, 203, 22 L. Ed. 612.
If the act of congress of February 3, 1897, above quoted, is invalid,
it is made so by virtue of the fifth amendment to the federal consti-
tution, which, in so far as it is pertinent here, declares that "no
person * * * shall be deprived of life, liberty or property with-
out due process of law." This is a limitation on the power of con-
gress, and the question is whether the attaching creditors will be
deprived of a property right in the cattle which they have caused
to be seized under the writ of attachment in their favor if the act
is given effect according to the manifest purpose of the lawmaker.

It is urged in behalf of the attaching creditors that the lien ob-
tained by virtue of the writ of attachment was of such a nature that
it could not be impaired by an act of congress, even if it had been
passed prior to the entry of the judgment by default against J. R.
Blocker, the mortgagor; and certain authorities are cited in sup-
port of that contention, notably Day v. Madden, 9 Colo. App. 464,
48 Pac. 1053; Mulnix v. Spratlin, 10 Colo. App. 390, 50 Pac. 1078;
Hall v. Stephens, 65 Mo. 670, 681; and Hannahs v. Felt, 15 Iowa,
141; but three of these cases—the same being those that are first
cited—were decided in states whose constitutions at the time de-
clared that "no * * * law retrospective in its operation
* * * shall be passed," and in two of the cases the ruling to the
effect that the lien of an attachment cannot be devested by a legis-

lative enactment at any time after the writ is levied appear to have been based mainly on the theory that to give an act of the legislature the effect of impairing an existing attachment lien would conflict with the local constitutional provision last quoted. The Iowa decision in Hannahs v. Felt, supra, does not appear to have been made under the influence of such a constitutional provision as has been adopted in Colorado and Missouri. In that case, however, the decision denying the efficacy of a legislative act to discharge the lien of an attachment was based principally on the ground that the act under consideration did not in terms attempt to devest such liens, but that its real purpose was to postpone for the time being sales of property belonging to persons in the military service, either under a mortgage, or deed of trust, or by virtue of an execution under a judgment or decree. In so far, however, as that decision lends support to the claim that an attachment lien cannot be impaired at any time by legislative action, even where the legislature is not deprived of the power to pass laws that are retrospective in their operation, it is not only opposed to the decision of this court in Bank v. Reithmann, 49 U. S. App. 144, 25 C. C. A. 101, 79 Fed. 582, but to the decisions of other courts in cases where the question has been expressly raised and decided. Freiberg v. Singer, 90 Wis. 608, 63 N. W. 754; Stephenson v. Doe, 8 Blackf. 508, 513. Considered as an original proposition, the weight of reason, as well as the authorities on kindred questions, sustain the view that an attachment lien, at least until a final judgment is rendered in the case, may be impaired, displaced, or destroyed by legislative enactments which are designed to have that effect, and that attaching creditors have no just ground to complain of such legislation. A writ of attachment is nothing more than a remedy afforded by law for the collection of a debt. It is like a capias ad respondendum, and a remedy of that nature may be abolished at any time by the legislature which created it. The same proposition holds good with respect to all laws which merely provide remedies for the enforcement of rights or the redress of grievances. They may be modified or repealed without reference to the effect of such legislation on pending actions, the only limitation on the power of the legislature in this respect being that an adequate remedy must remain or be provided for the enforcement of such existing rights as have their origin in private contracts. In actions ex contractu litigants are not entitled to insist that they shall be afforded the same remedies or be privileged to plead all of the defenses that were available when the contract was made, or that have accrued subsequently under existing laws; the rule being that remedies, and those rights pertaining to the remedy which are purely of statutory creation, may be altered or abolished, even after an action is instituted, provided an adequate remedy remains for rights founded on contract, and that some defenses, such as those existing under usury laws and those that have accrued under statutes of limitation, may be withdrawn, and rendered of no avail. These principles are so familiar that a few cases only need be cited in their support. Terry v. Anderson, 95 U. S. 628, 633, 24 L. Ed. 365; Campbell v. Mining Co.,

83 Fed. 643, 645, 27 C. C. A. 646, 55 U. S. App. 150; Wilson v. Simon (Md.) 45 Atl. 1022; Campbell v. Holt, 115 U. S. 620, 628, 6 Sup. Ct. 209, 29 L. Ed. 483; Ewell v. Daggs, 108 U. S. 143, 151, 2 Sup. Ct. 408, 27 L. Ed. 682; Morley v. Railway Co., 146 U. S. 162, 168, 13 Sup. Ct. 54, 36 L. Ed. 925; Von Hoffman v. City of Quincy, 4 Wall. 535, 553, 18 L. Ed. 403; Butler v. Palmer, 1 Hill, 324, 329, 330; Curtis v. Leavitt, 15 N. Y. 1, 152, 153; Suth. St. Const. § 482. We are of opinion, therefore, that a legislative body like the congress of the United States, which is not prohibited from passing retrospective or retroactive laws, has an undoubted power to devest or impair an attachment lien, at least until there has been an adjudication that adequate grounds for the attachment exist, and that the lien of the attachment be enforced. The power of congress to deal with a remedy which it has provided for the collection of a debt does not cease as respects a suitor who has simply taken the initial steps to avail himself of the remedy, but whose rights have not been finally adjudicated. The power in question continues, in any event, until such time as, by making use of the remedy, the suitor has acquired a title to or an interest in specific property which the parties to the action are no longer privileged to deny. It is only at such period that his rights can be said to have become vested. Prior thereto they are merely conditional or inchoate.

It is insisted, however, in behalf of the attaching creditors that they acquired a vested right or a vested interest in the cattle by the rendition of the judgment by default on January 29, 1897, which could not be impaired by a subsequent legislative enactment, and that this proposition is tenable, even if it be true, as last above held, that prior to that time the lien of the attachment might have been displaced by an act of congress. With reference to this contention it may be said that it is undoubtedly true that by the rendition of the judgment by default Blocker, the defendant in the attachment suit, lost his right to challenge the existence of the grounds of attachment on account of which the writ had been obtained, as well as the right to deny the fact of his indebtedness to the attaching creditors, or the amount thereof. These were issues which the defendant in the attachment suit, and he alone, was entitled to raise. The Evans-Snider-Buel Company was not concerned therein; and it is doubtful, to say the least, if it was entitled to be heard with respect thereto, since its right to the cattle depended on other considerations. But, be this as it may, the judgment by default did not determine, as against the party last named, who had intervened in the attachment suit, as it had a right to do, and had denied the right of the attaching creditors to subject the attached property to the payment of their claims, that it could be so appropriated. That was an issue which remained to be tried when the act of congress of February 3, 1897, was approved, and it was in no wise affected by the judgment by default. It is difficult to understand, therefore, why the entry of that judgment changed the status of the case eo instanti as respects the interpleader, and deprived congress thenceforth of the power to enact a law which prior thereto it possessed the power to enact. The interpleader's rights were not ad-

judicated, since the judgment by default did not determine that
the lien asserted by the attaching creditors upon the cattle in con-
troversy was superior to the lien which was asserted by the inter-
pleader. That question remained undecided, and was left open,
after the judgment by default, for future consideration and decision.
The phrase "a vested right" has no very precise signification. It is
an expression which is not used in the federal constitution, nor in
any of its amendments; the language of the fifth amendment being
that "no person   *   *   *   shall be deprived of   *   *   *   property
without due process of law." In the law of real property—where it
is most frequently employed—the word "vested" is used to define an
estate, either present or future, the title to which has become estab-
lished in some person or persons, and is no longer subject to any con-
tingency. And when the phrase "a vested right" or a "vested inter-
est" is used in other relations it may with reasonable precision be
held to mean some right or interest in property that has become fixed
or established, and is no longer open to doubt or controversy. If the
words in question are understood in that sense, it cannot be said that
the attaching creditors acquired a vested right to the cattle, as
against the interpleader, by the judgment in their favor against
Blocker. Instead, however, of seeking for an exact definition of the
phrase in question, we think it will be more profitable for present pur-
poses to refer to some of the cases, and particularly to those which are
of controlling authority here, where it has been held that rights ac-
quired in virtue of existing laws, and claimed to be vested, were not so
far vested as to become property within the meaning of the federal con-
stitution, and to be for that reason beyond the reach of legislative ac-
tion. Thus, in the case of Morley v. Railway Co., 146 U. S. 162, 13 Sup.
Ct. 54, 36 L. Ed. 925, a judgment had been obtained, which, under ex-
isting laws, bore interest at a given rate. After its rendition the
legislature reduced the rate of interest on judgments, doing so in
language which made the act applicable to judgments that had been
recovered before the act was passed. It was held that this law
neither impaired the obligation of a contract nor deprived judgment
creditors of their property without due process of law. In Camp-
bell v. Holt, 115 U. S. 620, 628, 6 Sup. Ct. 209, 29 L. Ed. 483, the
right to plead the statute of limitations against a personal indebt-
edness had accrued in favor of the debtor when the bar of the stat-
ute was removed by the adoption of a new constitution. It was
held that the debtor had no right to complain. The court said,
"We certainly do not understand that a right to defeat a just debt
by the statute of limitations is a vested right so as to be beyond
legislative power in a proper case." In Ewell v. Daggs, 108 U. S.
143, 2 Sup. Ct. 408, 27 L. Ed. 682, a right which had accrued to a
debtor to plead usury as a defense under a law that was in force
when the contract was entered into was taken away by a subse-
quent enactment, and it was held that no valid objection could be
urged against such legislation. In Butler v. Palmer, 1 Hill, 324,
it appeared that at the time of the sale of a judgment debtor's land
under an execution the law allowed him a certain time to redeem,
and the master's deed specified this period of redemption on its

face. A subsequent statute repealed the law granting such period for redemption, and prescribed a shorter period within which the right must be exercised. It was held that the right to redeem within the period named in the master's deed was not so far vested that it could not be shortened by legislative action. See, also, People v. Livingston, 6 Wend. 526. In Green v. Abraham, 43 Ark. 420, a mortgage improperly acknowledged had been placed of record, which, by reason of a defective acknowledgment, was not notice to subsequent purchasers or lienors. Afterwards the mortgaged property was attached under a writ against the mortgagor, and thereafter the legislature validated the record of the mortgage. The mortgagee having brought replevin to recover the attached property from one who claimed it under the attachment, it was held, in substance, that the interest of the attaching creditor in the attached property was not vested, but could be, and that it was in fact, displaced by the subsequent enactment validating the record of the mortgage. The following cases are similar to those already cited, and, as we think, uphold the same doctrine: Freeborn v. Smith, 2 Wall. 160, 175, 17 L. Ed. 922; Baker's Ex'rs v. Kilgore, 145 U. S. 487, 12 Sup. Ct. 943, 36 L. Ed. 786; Terry v. Anderson, 95 U. S. 628, 633, 24 L. Ed. 365; Garrison v. City of New York, 21 Wall. 196, 205, 22 L. Ed. 612; Louisiana v. Mayor, etc., of City of New Orleans, 109 U. S. 285, 289, 3 Sup. Ct. 211, 27 L. Ed. 936; Grinder v. Nelson, 9 Gill, 299, 309; Town of Danville v. Pace, 25 Grat. 1, 15; Satterlee v. Matthewson, 16 Serg. & R. 169; Wilson v. Simon (Md.) 45 Atl. 1022. It may be difficult in some cases to fix the precise date at which a right can be said to be fully vested, and for that reason to have become property within the meaning of the federal constitution, when the right in question is purely of statutory creation, or has been acquired by pursuing some remedy which the law affords to suitors, and is in no sense an obligation arising out of contract; but we are of opinion that the right invoked in the case at bar was not vested on February 3, 1897, in any such sense as to be outside the sphere of legislative control. When called upon to resolve questions like the one in hand, the courts have never deemed it necessary to close their eyes to the equities of the case, but have frequently permitted their judgments to be influenced by the consideration that that which the legislature has done in the way of disturbing rights acquired under existing laws was morally right, and in accordance with justice and fair dealing. In an early case (Foster v. Bank, 16 Mass. 245, 273), Parker, C. J., remarked, "The truth is, there is no such thing as a vested right to do wrong;" and this remark has been quoted with approval by the supreme court of the United States and other courts. Freeborn v. Smith, 2 Wall. 160, 175, 17 L. Ed. 922; Freeland v. Williams, 131 U. S. 405, 420, 9 Sup. Ct. 763, 33 L. Ed. 193; Goshorn v. Purcell, 11 Ohio St. 652; Town of Danville v. Pace, supra; Satterlee v. Matthewson, supra. And in Randall v. Kreiger, 23 Wall. 137, 149, 23 L. Ed. 124, the supreme court said, speaking with reference to a legislative act which impaired an existing title: "Claims contrary to justice and equity

cannot be regarded as of that character [that is to say, as vested rights]. Consent to remedy the wrong is to be presumed."

It is our privilege and duty, therefore, in determining whether a vested right has been violated and whether congress exceeded its just power in validating the interpleader's mortgage, to consider whether its action was dictated by a sense of justice, and was right when viewed from a purely moral standpoint. If it was, a more liberal view may well be taken of its power to displace the attaching creditor's lien than would be permissible if its action was partial, or arbitrary, and without just cause or excuse. Viewing the case for the purpose last indicated, it is manifest at a glance that congress was influenced by the highest considerations of public policy to pass the act of February 3, 1897, and that, in so far as the interpleader and others in a like situation were concerned, it was justified in stretching its constitutional powers to their utmost limit to prevent the consummation of a grievous wrong. The cattle in controversy had been bought and paid for with the money of the interpleader, with the understanding that they should be mortgaged to secure its repayment. Such a mortgage was executed. The transaction was fair and honest, and all the publicity was given thereto which the circumstances permitted. We understand the local law to be that the mortgage so executed was, in any event, good as between the mortgagor and mortgagee, for such was the decision in Main v. Alexander, supra. The attaching creditors' debt was contracted long prior to the purchase of the cattle and the execution of the mortgage, and they had actual knowledge of its execution, and of the record thereof, before they caused the writ of attachment to be levied. The attaching creditors seem, therefore, to have made a deliberate attempt to appropriate the property of the interpleader to the payment of another's debt by taking advantage of a defect in the law, doing so in utter disregard of the doctrine which has been generally accepted by courts of equity since the decision in Le Neve v. Le Neve, 3 Atk. 646, 2 White & T. Lead. Cas. Eq. 35, that one who purchases property with full knowledge of another's interest therein, and with intent to deprive him of that interest, is a purchaser mala fide. Under these circumstances it was the duty of congress to afford all the relief against the threatened wrong which could be afforded by a liberal interpretation of its legislative powers; and it is likewise the duty of the courts in such a case to construe those powers liberally, to the end that a wrong may not be perpetrated through the forms of law. It may be that there is a legal presumption that, when congress extended the chapter of the Arkansas statute concerning mortgages over the Indian Territory, it was aware of the interpretation that had been placed upon the various provisions of that chapter by the supreme court of that state; but a legislative body is not omniscient, and, whatever may be the presumption, we are unable to believe that congress possessed such knowledge in fact, and that it intended to deprive nonresidents of the territory of the power to make a mortgage on personal property there located which would be effectual to protect mortgagees against the claims of third parties. We can conceive of no reason which,

would be liable to influence congress to enact a law of that character, and are, therefore, constrained to believe that the peculiar construction placed on sections 4742 and 4743 of the mortgage act by the supreme court of Arkansas was unknown to congress when they were made applicable to the Indian Territory, and that it made haste to cure what it deemed to be an obvious defect or omission in the law as soon as its attention was directed to the defect. The act of February 3, 1897, stands on the same plane, therefore, as a curative act, and should be treated as a statute which was enacted for the purpose of remedying a mistake theretofore inadvertently made by the lawmaker. When the attention of congress was directed to the peculiar construction that had been placed on the aforesaid sections of the mortgage act in the state from which it was borrowed, it found the controversy between the attaching creditors and the interpleader still pending and undetermined. The rights of the former were in fieri. No court had at that time decided that they were entitled, as against the interpleader, to subject the mortgaged property to the payment of their judgment against the mortgagor; and believing, doubtless, that such an adjudication, if made, would defeat, rather than promote, the ends of justice, it undertook to forestall a possible decision of that nature by validating the record of the interpleader's mortgage. We are of opinion that the concluding clause of the act of congress of February 3, 1897, which was designed to accomplish that end, was a lawful enactment, and not in conflict with any provision of the federal constitution, because at the date of its enactment the attaching creditors had no such vested right or interest in the cattle in controversy as the constitution was intended to protect against legislative action.

Learned counsel for the interpleader have argued at some length that the United States courts in the Indian Territory were and are under no obligation to construe sections 4742 and 4743 of the chapter concerning mortgages as they were construed in Main v. Alexander, supra, because that decision is in conflict with other decisions of the supreme court of Arkansas on kindred questions, and because it has been discredited by judicial criticism in the state of Arkansas, and cannot be regarded as settling the true construction of the statute in controversy, even in the state where it originated. They also claim that the attachment writ only operated upon such interest in the cattle as the mortgagor had at the time the writ was levied, and that this interest was a mere equity of redemption, the mortgage being, in any event, good as against the mortgagor. Some other propositions are also advanced, all of which have been noticed, but, without expressing an opinion thereon, we prefer to rest our decision on the ground heretofore stated, that the act of congress operated to validate the interpleader's mortgage. The judgment of the United States court of appeals in the Indian Territory is accordingly reversed and annulled, and the judgment of the United States court in the Indian Territory for the Northern district thereof, which was rendered at its March term, 1899, being for the right party, is in all things affirmed.

SANBORN, Circuit Judge (dissenting). The validity of the act of February 3, 1897, as construed by the majority of this court, in view of the basic principles of the social compact and of the fifth amendment to the constitution, which declares that "no person shall be deprived of life, liberty or property without due process of law," is best tested by a candid look at its legal effect upon the property of the parties to this action. It is conceded by the opinion of the majority, and it was settled by the statutes then in force in the Indian Territory and by the uniform decisions of the supreme court of Arkansas interpreting those statutes from 1843 to 1891 (Main v. Alexander, 9 Ark. 112, 117; Hannah v. Carrington, 18 Ark. 85, 105; Jacoway v. Gault, 20 Ark. 190, 193; Haskell v. Sevier, 25 Ark. 152, 158; Ford v. Burks, 37 Ark. 91, 94; Dodd v. Parker, 40 Ark. 536, 540; Watson v. Lumber Co., 49 Ark. 83, 87, 4 S. W. 62; Cross v. Fombey, 54 Ark. 179, 184, 15 S. W. 461), that on the morning of February 3, 1897, the defendants in error had a first and specific lien impervious to the attacks of the mortgagee, the Evans-Snider-Buel Company, either at law or in equity, for the amount of the judgment which they had obtained in their attachment suit against Blocker,—$55,875.71,—upon the cattle that had been seized under the attachment, which were found to be worth $75,000. When that day closed, if the conclusion of the majority is right in this case, the congress of the United States had, by the act of February 3, 1897, devested the defendants in error of all beneficial interest in the cattle or in the lien which they held upon them, and had granted to the Evans-Snider-Buel Company a first lien for $130,000 upon these cattle, and had thereby deprived the defendants in error of all real interest in the stock. In other words, before the act of February 3, 1897, was approved, the defendants in error had a first lien upon the cattle which was worth $55,875.71, and the mortgagee had an inferior lien which was worth only the difference between the amount of this first lien and $75,000, or $19,124.29. The instant that act was approved, the mortgagee had a first lien on the cattle for $130,000, which was worth $75,000, and the defendants in error had nothing. The act of congress had the effect to transfer instantly property of the value of $55,875.71 from the defendants in error to the plaintiff in error the Evans-Snider-Buel Company. It is not pretended that this was accomplished by any process of law, due or undue. It was done, if done at all, by the arbitrary act of the congress of the United States, without notice, trial, or hearing. In my opinion, an act of congress or of a state legislature which has such an effect not only violates the fifth amendment of the constitution, but is beyond the powers of the legislative department of a republican government. Calder v. Bull, 3 Dall. 383, 388, 1 L. Ed. 648; Tyrrell v. Rountree, 7 Pet. 463, 468, 8 L. Ed. 749; Gunn v. Barry, 15 Wall. 610, 622, 21 L. Ed. 212; Fletcher v. Peck, 6 Cranch, 87, 135, 3 L. Ed. 162; Tillotson v. Millard, 7 Minn. 513 (Gil. 419); Grinder v. Nelson, 9 Gill, 299, 307; Regents v. Williamson, 9 Gill & J. 365, 408; Bank v. Ballou (Va.) 32 S. E. 481, 483; Wade, Retro. Laws, §§ 159, 191; Gilman v. Tucker (N. Y. App.) 28 N. E. 1040; Ratcliffe v. Anderson, 31 Grat. 105; Murphy v. Gaskins' Adm'r,

28 Grat. 207, 222; Alter's Appeal, 67 Pa. St. 341; McCarty v. Hoffman, 23 Pa. St. 507; Greenough v. Greenough, 11 Pa. St. 489; Wap. Attachm. (2d Ed.) §§ 17, 736; 1 Shinn, Attachm. §§ 322, 452; Frellson v. Green, 19 Ark. 376; Bergman v. Sells, 39 Ark. 97, 101; Cole v. Cunningham, 133 U. S. 107, 116, 10 Sup. Ct. 269, 33 L. Ed. 538; Richardson v. Adler, 46 Ark. 49; Wade, Retro. Laws, §§ 171, 173. In the discussion of the question at issue it must be borne in mind that it was not a mere judgment against the person, or the right to enforce such a judgment, or a mere general lien to secure it, of which the defendants were here deprived. But it was a specific and absolute lien, fixed by the judgment of the court upon personal property which had been reduced to the possession of the officer of that court, and which was property owned by the defendants in error, and worth more than $55,000.

In Calder v. Bull, 3 Dall. 388, 1 L. Ed. 648, Mr. Justice Chase said:

"There are certain vital principles in our free republican governments which will determine and overrule an apparent and flagrant abuse of legislative power: as to authorize manifest injustice by positive law, or to take away that security for personal liberty, or private property, for the protection whereof the government was established. * * * A law that punishes a citizen for an innocent action, or, in other words, for an act which, when done, was in violation of no existing law; a law that destroys or impairs the lawful private contracts of citizens; a law that makes a man a judge in his own cause; or a law that takes property from A. and gives it to B.,—it is against all reason and justice for a people to intrust a legislature with such powers; and therefore it cannot be presumed that they have done it."

In Tyrrell v. Rountree, 7 Pet. 466, 8 L. Ed. 749, after a judgment had been rendered in an attachment suit, and a writ of venditioni exponas issued to sell land which had been attached, the county was divided by a legislative act, and the claim was made that this devested the lien upon the property in the new county, so that a sale thereof could not be made. Chief Justice Marshall said:

"The counsel for the plaintiffs in error has argued the cause as if the process under which the sale was made had been the usual execution awarded on a judgment rendered against a person brought into court by regular process. Without inquiring whether his objections to the charge would have been well founded had that been the character of the case, it is sufficient to observe that in the actual cause the land itself was attached. Not having been released, it remained in the custody of the officer, subject to the judgment of the court. An interest was vested in him for the purposes of that judgment. The judgment did not create a general lien on it, but was a specific appropriation of the property itself to the satisfaction of that particular judgment. The process which issued did not direct the officer to levy it on the property of the defendants, but to sell that specific property which was already in his possession by virtue of the attachment, and was already condemned by the judgment of the competent tribunal. The subsequent division of the county could not devest this vested interest, nor deprive the officer of the power to finish a process which was rightly begun."

In Gunn v. Barry, 15 Wall. 610, 622, 21 L. Ed. 212, a case was presented in which a creditor had obtained a judgment against a defendant, which was a lien upon a large portion of his land, and before that judgment was enforced by execution sale the state of Georgia adopted a constitution, which, by its terms, exempted from

105 F.—20

execution sale all the land of the defendant in the judgment. Mr. Justice Swayne, in delivering the opinion of the supreme court, said of this constitution:

"The effect of the act in question, under the circumstances of this judgment, does not, indeed, merely impair, it annihilates, the remedy. There is none left. But the act reaches still further. It withdraws the land from the lien of the judgment, and thus destroys a vested right of property which the creditor had acquired in the pursuit of the remedy to which he was entitled by the law as it stood when the judgment was recovered. It is, in effect, taking one person's property, and giving it to another, without compensation. This is contrary to reason and justice, and to the fundamental principles of the social compact."

No further authority would seem to be required to establish the propositions that the specific lien upon the cattle which the defendants in error had perfected by their judgment against Blocker was a "vested right of property," and that its transfer from them to the mortgagee was "taking one person's property, and giving it to another, without compensation." If, however, other authority is desired it will be found in the decisions to which reference has been made above.

A careful perusal of the authorities referred to in the opinion of the majority discloses no decision of the supreme court, and no persuasive opinion of any court, which sustains the proposition that the legislative department of our government may by an arbitrary act deprive one of a specific and perfected lien upon property which is worth more than $50,000, and vest it in another without compensation. The decisions of the supreme court cited by the majority, to the effect that interest on a judgment is a penalty for its nonpayment, and that from the time of the passage of a law it may be reduced by legislative enactment, even upon judgments rendered before the act passed (Morley v. Railway Co., 146 U. S. 162, 13 Sup. Ct. 54, 36 L. Ed. 925); that the remedy for the enforcement of a personal judgment (which created no lien) against a municipality for damages resulting from mob violence may be lawfully taken away because the collection of such damages is a mere matter of public policy, while the removal of the remedies for the collection of an ordinary judgment for tort by legislative act would be unconstitutional (Louisiana v. Mayor, etc., of City of New Orleans, 109 U. S. 285, 291, 3 Sup. Ct. 211, 27 L. Ed. 936); that the removal of the bar of the statute of limitations against a personal debt does not impair any contract of the debtor, or deprive him of any property which he possessed, while the removal of the bar of such a statute against the assertion of a claim to either personal or real property is a violation of the fifth amendment to the constitution, and a taking of property without due process of law (Campbell v. Holt, 115 U. S. 620, 623, 628, 6 Sup. Ct. 209, 29 L. Ed. 483); that a debtor has no vested right to plead and recover the penalty prescribed by a statute for usury, and that a law repealing such a statute may well apply to prior contracts (Ewell v. Daggs, 108 U. S. 143, 150, 2 Sup. Ct. 408, 27 L. Ed. 682),—seem to me to have no tendency to show that the supreme court has ever sustained or intimated that it would permit the bald taking of $50,000 worth of private prop-

erty from one person to give it to another without compensation.
It would be unprofitable to review the cases cited from the state
courts in the opinion of the majority, because the decisions of the
supreme court to which reference has been made are conclusive
upon this question, and render the consideration of other authorities
unnecessary.  It may, however, be remarked in passing that the de-
cision in Butler v. Palmer, 1 Hill, 324, that, after the sale of a judg-
ment debtor's land under execution, a statute may be lawfully passed
curtailing the period of redemption, is by no means the settled law
of the land, and that the counter proposition is well sustained by
reason and authority.  Willis v. Jelineck, 27 Minn. 18, 6 N. W. 373;
O'Brien v. Krenz, 36 Minn. 136, 30 N. W. 458; Heyward v. Judd,
4 Minn. 483 (Gil. 375); Hillebert v. Porter, 28 Minn. 496, 11 N. W.
84, and the cases there cited.  Attention may also be called to the
fact that the decision of the supreme court of Arkansas in Green
v. Abraham, 43 Ark. 420, 425, is inapplicable to the questions pre-
sented in this case, because it rests upon the proposition that the
mere levy of an execution upon personal property under a personal
judgment which creates no lien vests no right of property in the
judgment debtor, and therefore a curative act validating a mort-
gage upon the property seized did not constitute the taking of pri-
vate property for private use.  The decision rests upon the proposi-
tion that the levy of the execution vested no right of property.  The
later decisions of that court, however, conclusively hold that the
entry of a judgment against the debtor in an attachment suit com-
pletes and perfects the lien of the attachment, and vests a right
of property in the judgment creditor.  Richardson v. Adler, 46 Ark.
49; Frellson v. Green, 19 Ark. 376; Bergman v. Sells, 39 Ark. 97, 101.

The argument that this specific lien upon the cattle evidenced by
the attachment and judgment might be stricken down by an arbitrary
act of congress because there are authorities which hold that the
repeal of a statute allowing attachments subsequent to the levy of a
writ and before judgment against the debtor lawfully destroys the in-
choate lien of the attachment is a non sequitur, is supported by no
authority, and is contrary to all the decisions upon the question which
have come under my notice.  The lien of an attachment is inchoate,
and conditional upon the entry of a judgment against the debtor
until that judgment is entered, but perfect, absolute, and unassailable
after such a judgment, and a judgment sustaining the attachment,
have been rendered.  There is respectable authority upon each side
of the question whether or not a legislative act impairing or destroy-
ing the inchoate lien of an attachment before judgment destroys a
vested right of property within the meaning of the fifth amendment
to the constitution.  Hall v. Stephens, 65 Mo. 670, 681; Hannahs
v. Felt, 15 Iowa, 141; Day v. Madden, 9 Colo. App. 464, 48 Pac. 1053;
Mulnix v. Spratlin, 10 Colo. App. 390, 50 Pac. 1078.  It is useless to
consider or discuss that question here, for the lien of the defendants
in error is not of that character.  On January 29, 1897,—three days
before the act of February 3d was passed,—they obtained a judgment
against the defendant Blocker not only that the latter was indebted
to them in the sum of $55,875.71, but also that their attachment of

these cattle be sustained. The amount of the claim of the defendants in error had been adjudicated, their lien by attachment upon the cattle, which were then in the custody of the court, and their right to the sale of these cattle and to the application of their proceeds to the payment of their judgment, had been adjudged to be perfect and absolute by a competent court having jurisdiction of their case three days before the act of February 3, 1897, was passed. The property of the defendants in error in the cattle was strictly analogous to and as great as the property of a mortgagee in mortgaged real estate after a decree of foreclosure of his mortgage and of sale of the land to satisfy his debt has been rendered against the mortgagor.

May the legislative department of the government lawfully deprive such a mortgagor of his lien, his property, and transfer it to a stranger, or to the holder of an inferior lien, by its mere fiat? If not, then congress could not lawfully deprive these defendants in error of their lien, their vested right, their property in these cattle, and transfer it to the Evans-Snider-Buel Company, by the act of February 3, 1897. The lien which they acquired by their attachment and their judgment was impervious to attack, either at law or in equity. It was absolute, perfect, enforceable, assignable, and salable. It was a complete and vested right. It was property worth $55,875.71, and was as completely vested in the defendants in error, and as perfectly protected by the law of the land, as acts of parties, laws, and decisions can vest or protect any property. All the authorities are that, while the lien of an attachment is inchoate and contingent until a judgment against the debtor is rendered, yet, after that judgment has been rendered, the lien of the attachment is merged in the judgment, which relates back to the date of the attachment, and evidences a perfected and absolute right to apply the attached property to the payment of the judgment; and that this is a vested right of property, as sacred and as valuable as it is possible to secure under the laws of our land. Cole v. Cunningham, 133 U. S. 107, 116, 10 Sup. Ct. 269, 33 L. Ed. 538; Bank v. Reithmann, 79 Fed. 582, 583, 25 C. C. A. 101, 102, 49 U. S. App. 144, 146; Richardson v. Adler, 46 Ark. 43, 49; Wap. Attachm. (2d Ed.) §§ 17, 736; 1 Shinn, Attachm. §§ 452, 322; Frellson v. Green, 19 Ark. 376; Bergman v. Sells, 39 Ark. 97, 101; 1 Black, Judgm. 298; 1 Freem. Judgm. § 90; Tillotson v. Millard, 7 Minn. 513 (Gil. 419); Lyon v. Sanford, 5 Conn. 545, 547, 549; Wade, Retro. Laws, §§ 171, 173.

In Bank v. Reithmann, 79 Fed. 582, 583, 25 C. C. A. 101, 102, 49 U. S. App. 144, 146, this court said:

"An attachment is an ancillary remedy provided by statute, by means of which a contingent lien is obtained and impressed upon property of a defendant, which becomes vested and perfected on entry of judgment and levy of execution."

In Richardson v. Adler, 46 Ark. 49, the supreme court of that state said:

"The lien relates back to the levy of the attachment, creating from that moment an inchoate charge, which was perfected by the rendition of judgment, and which could not be devested by any change in the status of the parties."

Mr. Shinn, in his work on Attachment, at section 572, declares that:

"A judgment sustaining the attachment and subjecting the property to execution perfects the lien created by the attachment, or, rather, it takes the place of such lien, and relates back to the time of the levy, and takes priority over all subsequent attachments, liens, or conveyances."

Mr. Waples, in his work on Attachment, at section 17, says:

"By the law of relation an attachment judgment retroacts to the time the property was first attached; to the time it was first subjected to garnishment; so that no incumbrances put upon it by its owner since that time can have higher rank than the attaching creditor's lien. Such retroaction makes the lien perfect from its first inception, as though created by the contract of the parties; as though it were a mortgage lien voluntarily put upon the property by the defendant himself."

There is no conflict in the authorities upon this question. The principles which have been adverted to are indisputable, and it follows from them inevitably that, if a vested right or a vested interest in property is, as the majority are willing to concede, "some right or interest in property that has become fixed or established, and is no longer open to doubt or controversy," then the defendants in error had such a right and interest in the cattle in the custody of the court on January 29, 1897, after their judgments against Blocker had been rendered, and until the act of February 3, 1897, was approved.

The suggestion of the majority that the judgment against Blocker did not evidence a vested right in the cattle in the defendants in error as against the Evans-Snider-Buel Company does not seem to be founded in fact, because, while that judgment did not estop the company from claiming the cattle from the defendants in error, and from litigating their claim, it did vest in the defendants in error an established lien and interest in the cattle superior to that of the Evans-Snider-Buel Company, which was no longer open to doubt or controversy in the courts or under the law of the land. The Evans-Snider-Buel Company was unable to doubt or to controvert it by any proceeding at law or in equity. The only way which they found to open this vested right and interest to doubt or to controversy was to secure this arbitrary act of congress boldly taking it from the defendants in error and transferring it to this mortgagee. If the suggestion of the majority was intended to be that this act of congress does not violate the constitution because there was no adjudication of a court which estopped this mortgagee from claiming the property of these defendants and litigating its unfounded claim, that suggestion proves too much, because it would establish the proposition that congress could lawfully take this property from the defendants in error, and give it to any one of the inhabitants of the United States except Blocker, and the still broader proposition that congress may lawfully deprive any man of his property, provided only that it does not transfer it to some party who has been estopped from litigating an unfounded claim against it by the judgment of some court. Judgments in favor of the owners and against all the world are not indispensable to the existence of vested rights of property, and the fact

that the defendants in error had no judgment against the Evans-Snider-Buel Company did not detract from the existence or the inviolability of their vested property in these cattle, since their right to them was established, and was impervious to the attacks of the mortgagee under the law of the land.

Nor does the argument that this act of congress, which takes from the defendants in error a vested right of property worth more than $55,000, and gives it to the Evans-Snider-Buel Company, should be held to be no violation of the prohibition of the constitution because "it was morally right, and in accordance with justice and fair dealing," seem persuasive to me. The moral right or wrong of an act of congress which takes the property of A, and transfers it to B, is not, in my opinion, the true, nor is it a safe, test of the violation of the fifth amendment to the constitution. A fatal objection to such a test is that the standard of moral right or wrong in the minds of men is variant. An act taking some of the property of a bad man and giving it to a good man, one taking part of the property of a rich man and giving it to a poor man, might be thought to be morally right, and in accordance with justice and fair dealing, by some, while it would be thought unjust and morally wrong by others. This very case illustrates the objection to this rule. To the majority of this court it seems to be morally right, and in accordance with justice and fair dealing, to take from these judgment creditors an established lien upon property which they had acquired in strict accord with the law of the land to secure a just debt, and which was worth more than $55,000, and to transfer this right of property to a mortgagee which had taken mortgages that under that law were fraudulent and void as against these judgment creditors; while to the minority this act seems to have been morally wrong, and subversive of the basic principles of a government established to protect the rights of person and of property. To me the fraudulent mortgagee seems to have no equitable or moral right to the cattle in question superior to that of the holder of the lawful lien. There was certainly nothing in the consideration or purpose of the loan made by the mortgagee to give it a superior equity over that of the judgment creditors. One has no higher right to the repayment of money loaned to enable a debtor to purchase cattle than he has to the repayment of money loaned to enable him to buy horses, or land, or bread. The consideration and purpose of the debt of Blocker to the defendants in error does not appear in this record, but the presumption is that it was a valuable consideration, and a worthy purpose, for the debt is evidenced by the judgment of a competent court of the state of Texas rendered in 1887. These defendants in error had waited for the payment of their debt more than 10 years when they acquired their lien upon these cattle, while the Evans-Snider-Buel Company had made its loan within a year preceding that date. So far, then, as the consideration and purpose of these two debts are concerned, those of the defendants in error must be deemed to be as meritorious as those of the mortgagee, and, as the defendants in error had waited more than 10 years for their money, while the mortgagee had not waited a year, certainly it was not unjust or inequitable for them to

secure the payment of their debt first. Nor is it perceived that there is anything in the character and the acquisition of the liens of these parties which gave to the mortgagee any higher right or superior equity to the payment of its debt over those which the judgment creditors held. The judgment creditors, in violation of no law or public policy, but in strict accord with the statutes and the decisions of the courts interpreting them, established by the judgment of a competent court a first and unassailable lien upon the cattle to secure their debt. The Evans-Snider-Buel Company took mortgages upon the cattle unaccompanied with any change of possession, which were, under the common law, prima facie fraudulent and void as against the defendants in error (Pyeatt v. Powell, 51 Fed. 551, 2 C. C. A. 371, 10 U. S. App. 200), and which, under the statutes in the Indian Territory and under the uniform interpretation of them for 48 years by the courts of Arkansas which came to the Indian territory as a part of those statutes, were conclusively fraudulent and void as against the defendants in error and as against all creditors of the mortgagor, although the latter had actual notice of their existence. Main v. Alexander, 9 Ark. 112, 117; Jacoway v. Gault, 20 Ark. 190, 193; Hannah v. Carrington, 18 Ark. 85, 105; Dodd v. Parker, 40 Ark. 540; Watson v. Lumber Co., 49 Ark. 83, 4 S. W. 62; Cross v. Fombey, 54 Ark. 179, 184, 15 S. W. 458. Now, has a creditor who has procured mortgage liens from his debtor which are fraudulent and void as against other creditors a moral right to the mortgaged property so much higher than that of judgment creditors who have established a valid and superior lien upon it of the value of $55,000 in accordance with the law of the land that a court ought to sustain an arbitrary act of the legislative department of the government which takes this $55,000 worth of property from the lawful lienholder without compensation, and gives it to the fraudulent mortgagee, in the teeth of the fifth amendment to the constitution, which declares that "no person shall be deprived of life, liberty or property without due process of law"? I think this question should be answered in the negative, and, whether or not this should be the answer, it seems to me that the constitutionality of an act of congress which deprives men of their property without any process of law is not to be determined by a consideration of the moral right or wrong of the act or of the equities of those who lose and those who gain by the fiat. Constitutions and laws are enacted to declare and command the right and to forbid the wrong. Any theory that their violation may be permitted, or excused, or overlooked because in the varying opinions of any man or set of men that violation was morally right or in accordance with justice and fair dealing is subversive of the fundamental principles of government and ought not to be sustained. The adoption of such a theory would be, in effect, to add to the inhibition of the constitution an exception which it does not contain, so that it would read: "No person shall be deprived of life, liberty or property without due process of law except in cases in which it is morally right and in accordance with justice and fair dealing to do so." When the people adopted the constitution, they determined that it was morally wrong to deprive any person of his property without due process of law,

under any circumstances. They ingrafted no exception upon this prohibition, and it is not the province of the courts to do so. The inhibition is clear, imperative, and without exception. It prohibits the deprivation of any man of his property without due process of law. The act of February 3, 1897, as it has been construed by the majority of the court, did, in my opinion, deprive the defendants in error of their property to the amount of more than $55,000, and was, therefore, to that extent unconstitutional and void.

For the reasons which have now been stated,—perhaps too much at length,—I am unable to concur in the opinion and conclusion of the majority in this case. I agree with the unanimous opinion of the court of appeals of the Indian Territory in which Judge Clayton has so logically, forcibly, and, to my mind, convincingly, presented the reasons why the act of February 3, 1897, had no effect upon the rights of the parties in this action, and why the judgment lien of the defendants in error was superior to the claims of the fraudulent mortgagee. McFadden v. Blocker (Ind. T.) 48 S. W. 1043, 1046–1053. The true construction of the act of congress probably is, as the court of appeals of the Indian Territory held, that it merely validated mortgages made by nonresidents from the date of the passage of the act, and had no retroactive effect. 48 S. W. 1048, 1053; Suth. St. Const. § 463; Chew Heong v. U. S., 112 U. S. 536, 539, 5 Sup. Ct. 255, 28 L. Ed. 770; Summer v. Mitchell (Fla.) 10 South. 562. But, if this is not the proper construction, the act falls under the ban of the fifth amendment to the constitution, and is violative of the fundamental principles of republican government; and in either event it was ineffectual to take away the established lien of the defendants in error, and to transfer their property to the mortgagee. For these reasons, the judgment below should, in my opinion, be affirmed.